Jose C. RODRIGUEZ,
Petitioner–Appellant,

v.

Warren YOUNG, Warden, Waupun
Correctional Institution,
Respondent–Appellee.

No. 89–1817.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1989.

Decided July 11, 1990.

Rehearing Denied Aug. 9, 1990.

Mark J. Rogers, Angermeier & Rogers, Milwaukee, Wis., for petitioner-appellant.

Daniel J. O'Brien, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for respondent-appellee.

Before CUMMINGS and FLAUM, Circuit Judges, and WILL, Senior District Judge.*

WILL, Senior District Judge.

Following a jury trial in Circuit Court in Milwaukee in 1976, Jose C. Rodriguez was convicted of first degree murder on the basis of an identification by a single witness and sentenced to life imprisonment. The appeals process has been long and exhaustive. Fourteen years later, in this, his second petition for a writ of habeas corpus, Rodriguez asks for relief on nine separate grounds, raising substantial questions about the admissibility of the sole identification testimony, the effectiveness of his counsel's assistance at trial, and the constitutionality of the instructions to the jury. The district court denied relief. *Rodriguez v. Young*, 708 F.Supp. 971 (E.D. Wis.1989). We affirm.

## I. BACKGROUND

On June 14, 1976 around 9 p.m., Jose Rodriguez (also known as "Boogie") and his wife Maria, the Alicea brothers—Edwin and Edgar—and Manuel Navarro (also known as "Jake") were all crowded around Ernesto Guzman (also known as "Ratone") outside a bar in Milwaukee. Watching from across the street was Maria Ramos. Guzman had been dealing heroin to Maria Rodriguez, who apparently shortchanged him on the transaction. When Guzman

* The Honorable Hubert L. Will of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation.

squawked, there was a fight. Guzman was stabbed, and he died from the wounds.

Three people were arrested in connection with Guzman's death: Jose Rodriguez and both Edwin and Edgar Alicea. Charges were never filed against Edwin, but Edgar and Rodriguez were each charged with murder. In the end, however, only Rodriguez' case went to trial. The case against Edgar was dismissed after he passed a polygraph test.

At the trial, there was conflicting testimony about who stabbed Guzman. According to Maria Rodriguez, as she and Guzman were arguing, her husband "came and pushed and told [Guzman] not to be touching me because I was his wife and that was wrong." But she said that when Guzman persisted, it was "Jake" (Manuel Navarro) who "grabbed [Guzman] and stabbed him."

Jake Navarro did not testify.

Edgar and Edwin Alicea each testified that they were present when the fight began, along with Navarro and Jose Rodriguez, but that after watching for a while, they left together to take a drive around the block and that when they returned, Guzman was dead on the ground. They also testified that parts of earlier statements they had given to the police had been lies, and Edwin testified in front of the jury that he would lie under oath to help Edgar beat a homicide rap. Maria Ramos testified that by the time the Aliceas returned, after the ride around the block, they had changed clothes.

Only Maria Ramos took the stand and identified Jose Rodriguez as the murderer. Parts of her testimony were in Spanish, through an interpreter. She said that during the fight outside the bar she "saw the hand of Boogie into the chest of Ratone" (Guzman) stabbing "two or three times." But she said she recognized that hand as Boogie's (Jose Rodriguez') only later and not at the time. She did not place Jake Navarro at the scene at all but did indicate that she knew him as one of her boyfriend's friends. She also testified that she had known Jose Rodriguez for at least a year before the night Guzman was killed.

She gave a positive in-court identification for Rodriguez as the murderer and then proceeded also to describe an earlier, out-of-court ID, given the morning after the stabbing.

The same night as the stabbing, Ramos went to the station house and looked at photos. She picked out and positively identified shots of Edgar Alicea and Guzman and told the police that besides those two there had also been a short, fat Spanish male wearing a green shirt, for whom she offered no name. She testified that she did not remember seeing photos of Rodriguez that first night, and there was no testimony, from her or the police, to indicate that she mentioned Rodriguez by name then.

The following morning, however, she returned to the police station and looked at more photos and during that session indisputably was shown a picture of Rodriguez, by a Detective Sandoval. Her reaction on seeing that photo is a matter of dispute. Sandoval did not testify at the trial. Instead, a Detective Schreiber testified, basing his testimony on a written report by Sandoval, that on the morning of the 15th Ramos picked out a photo of Rodriguez, named him as a person known to her as "Boogie," and told Sandoval that Boogie stabbed Guzman in the chest and also held Guzman while Edgar Alicea stabbed him.

Ramos' own recollection of what she told Sandoval on the morning of the 15th was a good deal muddier. When the question was put to her on direct, she could not recall what she had said. Portions of Sandoval's report were read to her, in Spanish, to refresh her recollection. The district attorney then asked:

Q: Does that refresh your recollection of what you told Detective Sandoval?

A: I would like for you to tell me what it is you want or expect me to say.

Q: I don't expect you to say anything except what is the truth and what occurred in this case. The question is: Do you remember telling Detective Sandoval after you have now reviewed that report that this photograph was a picture of one of the men involved in the murder—

DEFENSE COUNSEL: Judge, I object to that as being—

THE COURT: Sustained. You don't have to argue it.

DEFENSE COUNSEL: I'm sorry.

Q: Do you remember seeing that photograph [a photograph of Rodriguez]?

A: Yes.

Q: Do you remember telling Detective Sandoval something about that photograph?

A: (Through Interpreter). That it looked like him, but I rather identify him with his back. That's what I did. I identified him from the back, Boogie.

After the session with Sandoval, the same morning, Ramos was taken from the police station to the district attorney's office and was shown Rodriguez in person. She saw him, apparently from the back only, and positively identified him as the murderer. On cross, Rodriguez' lawyer repeatedly asked her whether she had ever, before that confrontation, told anyone that Rodriguez was the murderer.

Q: What did you tell the police?

A: That was Boogie.

Q: Did you tell them anything else about Boogie?

A: That I had to see his back to identify him.

Q: Pardon me?

A: I identified him from the back.

Q: Had you ever told anyone that you thought it might be Boogie before you saw his back [during the confrontation at the district attorney's office]?....

A: Yes.

Q: Who did you tell that to?

A: I don't remember to who.

* * * * * *

Q: Did you tell anyone in the world, anyone—be it a friend, a police officer, or anyone—that you thought Boogie was the man on the corner or one of the men on the corner involved in Ratone's death before you saw Boogie in the District Attorney's office?

DISTRICT ATTORNEY: Your Honor, that has been already asked and answered.

RAMOS: Yes.

Q: (By defense counsel:) Who?

THE COURT: Just a minute. The objection is overruled and is in the record. Now, you may proceed.

Q: Did you tell that to—

A: I don't remember.

Rodriguez' lawyer then pressed further, on the assumption that Ramos was lying and had not mentioned Boogie to anyone before. What was it about seeing Rodriguez at the district attorney's office that all of a sudden enabled her to identify him as the murderer, when she had never done that earlier? She knew him and knew what he looked like. She had not named him the first night at the station, had not made a positive ID from the photos alone, and said she had not recognized him at the scene of the murder. Then how was it, asked Rodriguez' lawyer, that she suddenly concluded that it was Rodriguez who killed Guzman?

Q: You say you knew Boogie for a year before this happened, right? And you saw a short, Spanish male involved in the scuffle or the fight on the corner the night Ratone was killed, right?

A: Right.

Q: You didn't know that was Boogie that night, did you?

A: No.

Q: Because you would have told the police Boogie was involved if you had seen Boogie there. Isn't that right?

A: Yes.

Q: You didn't know who was the short, fat Spanish male that was there that night, did you?

A: No.

Q: You didn't know that, or you didn't come to that conclusion or idea until you got to the District Attorney's Office a couple of days later. Isn't that right?

A: When I saw him at the District Attorney's Office.

* * * * * *

Q: Did you see his face when you were in the district attorney's office?

A: When I identified him?

Q: Yes.

A: I identified him by his back, and then I went back to the room where I was.

Q: In other words, you didn't look at that person's face when you identified him?

A: Because I knew it was him.

Q: You knew it was who?

A: Boogie, the man I saw.

Q: But at the time you saw the man, you didn't know that was Boogie, did you?

A: Well, no.

Q: So something happened in between the time you saw him or claimed to have seen him on the corner on the 14th of June and the time you saw just his back in the District Attorney's Office. Isn't that correct?

＊　　＊　　＊　　＊　　＊　　＊

Q: Did you know Boogie was going to be in the District Attorney's office before you got there?

A: (No response.)

Q: Do you know what I mean? Did someone tell you that Boogie was going to be at the District Attorney's Office?

A: To identify him.

Q: Did someone tell you that he would be there for any reason?

A: I don't remember.

Q: When you looked at his back, did you know whose back it was?

A: Yes.

Q: Whose back was it?

A: Boogie.

＊　　＊　　＊　　＊　　＊　　＊

Q: Did you recognize it that night as being the back of Boogie?

A: I—his movement I have seen, you know, that I have seen that short and—I have seen Boogie's back. That night of the murder?

Q: Yes.

A: I didn't know it was him, but his movements, you know, his movements. I can't explain it.

THE INTERPRETER: Can you repeat that question?

Q: (Defense counsel): The night that Ratone was killed, you saw the back of a short Spanish man. Isn't that right?

A: Right.

Q: And did you know that was Boogie at that time?

A: No.

Q: Did you see his face at that time?

A: Everything was fast. I don't know if I did see his face. I wasn't paying too much attention.

Q: Then, the next time you claimed to have seen Boogie was in the District Attorney's Office. Isn't that right?

A: Right.

Q: Did you see his face at that time or just his back?

A: When I identified him?

Q: Yes.

A: His back.

Q: So, you were behind him, and you looked at the back, and you said, "That's Boogie," right.

A: That's the man I saw.

Q: Did you say that?

A: Yes.

Q: Did you know whose back it was when you looked at him from behind? When you were in the District Attorney's Office, did you know that was Boogie you were looking at?

A: Yes.

Q: How did you know that?

A: Because I have seen pictures.

## II. RAMOS' TESTIMONY

Rodriguez urges that Ramos' identification testimony should have been suppressed. In state appellate court, he did not get very far with that argument. His counsel did not move for suppression of Ramos' testimony either before or during trial, and when he did finally raise the issue on direct appeal, the Wisconsin Court of Appeals held that he had waived it by not acting earlier. See Wis.Stat. § 971.31(2) (1977).

A defendant who defaults on an issue in state court is not necessarily barred from obtaining collateral review of that same issue in federal court, however. The effects of a procedural default may be undone three ways. First, a habeas petitioner can revive a defaulted claim by

showing "cause" for the default plus actual "prejudice" resulting from it. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Second, a prisoner can save a defaulted claim by treating counsel's failure to raise it properly as an independent sixth amendment violation under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). These first two routes overlap since deficient performance under *Strickland* constitutes "cause" for a default, *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986), and for many defendants they tend to converge, because the categories of *Sykes* "cause" apart from *Strickland* ineffectiveness are narrow and instances of it are rare.[1]

In addition to showing ineffectiveness under *Strickland,* or some other form of "cause" under *Sykes*, a prisoner seeking collateral review of a defaulted claim must also demonstrate "prejudice." Neither cause without prejudice nor prejudice without cause gets a defaulted claim into federal court.

Under *Strickland,* the test for prejudice is well established:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. But it remains an open question whether *Strickland*'s "reasonable probability" standard, which defines "prejudice" for sixth amendment claims, also applies as the standard for prejudice under *Sykes,* when what the defendant offers as "cause" to explain his earlier default is something other than counsel's failure to live up to the minimal levels of performance guaranteed by the sixth amendment.[2]

There is, finally, also a third way of obtaining habeas relief on a defaulted claim, an extra safeguard against miscarriages of justice and "fundamentally unjust incarceration." *Carrier,* 477 U.S. at 495-96, 106 S.Ct. at 2649-50. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.,* at 496, 106 S.Ct. at 2649. Accord *Smith v. Murray,* 477 U.S. 527, 537, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986); *Buelow v. Dickey,* 847 F.2d 420, 427 (7th Cir.1988).

In urging us to review his defaulted claim, Rodriguez argues both that his lawyer's performance slipped below *Strickland*'s standards and that his conviction was the result of a miscarriage of justice.

### A. *Cause/Ineffective Assistance*

Rodriguez contends that the confrontation in the district attorney's office was

---

1. For examples of "cause" which do not involve *Strickland* ineffectiveness, see *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (failure to raise a claim due to "some objective factor external to the defense"—such as government misconduct in suppressing facts giving rise to the claim, e.g., *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988)—constitutes "cause" for a procedural default) and *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984) (failure to raise a claim the basis for which was created by a subsequent change in the law constitutes "cause"). But for a sharp limitation on the sweep of *Reed v. Ross,* see *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (new rules will not, in general, be applied or announced on collateral review) and, to the same effect, *Butler v. McKellar,* — U.S. —, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990).

2. The Supreme Court has purposefully kept the definition of prejudice flexible. See *United States v. Frady,* 456 U.S. 152, 168-69, 102 S.Ct. 1584, 1594-95, 71 L.Ed.2d 816 (1982); *Sykes,* 433 U.S. at 91, 97 S.Ct. at 2508. It has been suggested, however, that in light of *Frady, Sykes* prejudice is at least something very similar to *Strickland* prejudice. See Jeffries and Stuntz, *Ineffective Assistance and Procedural Default in Federal Habeas Corpus,* 57 U.Chi.L.Rev. —— (1990) (forthcoming). See also *Cook v. Lynaugh,* 821 F.2d 1072, 1079 (5th Cir.1987). But there may be room for argument that *Strickland* prejudice and *Sykes* prejudice should not be equated and that the *Sykes* version is more stringent. See Marcus, *Federal Habeas Corpus After State Court Default: A Definition of Prejudice,* 53 Fordham L.Rev. 663, 701-03 (1985).

impermissibly suggestive and corrupted Ramos' ability to ever reliably identify him—either at the time or subsequently, in court,—and that accordingly, her identification testimony should have been excluded. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). But his lawyer never moved to suppress.

■ Simply showing that a motion that might have been brought wasn't, does not by itself demonstrate cause for a procedural default. *Carrier*, 477 U.S. at 486–87, 106 S.Ct. at 2644–45. "Ignorant or inadvertent attorney error" is not enough. *Id.* Rodriguez, however, argues that in not moving to suppress his lawyer was not just careless but constitutionally ineffective. He says that a reasonably effective lawyer would have moved to suppress and would have won the motion, that as a result of his lawyer's ineptitude, the jury heard testimony from Ramos that it never should have, and that without that testimony there would not have been enough evidence to support a conviction. He has not alleged that any "objective factor external to [his] defense" impeded counsel. *Carrier*, 477 U.S. at 488, 106 S.Ct. at 2645.

■ In June 1985, more than eight-and-a-half years after the jury verdict, an evidentiary hearing was held in an effort to develop a record on the question of ineffective assistance. Rodriguez' trial lawyer testified that although he had considered bringing a motion to suppress, he eventually decided against it for three reasons. In the first place, he said, "I think the primary reason was that I didn't feel I could bring it in good faith because [Rodriguez and Ramos] knew each other ... and I can't ever recall bringing [a motion to suppress] when the parties knew each other." Second, he said "that [since] there was no issue as to whether Rodriguez was present at the scene at one time or the other," he did not think it was necessary to move to suppress her identification testimony. Third, he said: "I don't recollect whether or not Mrs. Ramos testified at the preliminary [hearing] or not.... If she had, I

may have not [moved to suppress] ... based upon what I felt her testimony was going to be, I felt that she was positively going to be an incredible witness in any event...."

None of these were valid reasons for deciding against a motion to suppress in this case. That Rodriguez and Ramos knew each other would not have been dispositive. Their acquaintance might certainly have provided an independent and reliable basis, sufficient to overcome any undue suggestion created by police procedures, for Ramos to identify Rodriguez as a man she knew. But the fact that she knew him is unrelated to whether he was the killer. The issue was not whether she recognized him generally but whether she recognized him as the person she saw stab Guzman. Similarly, a motion to suppress would not have been directed to excluding testimony that Rodriguez was present at the scene of the crime, but rather to suppressing any identification of Rodriguez as someone who held Guzman still while he was stabbed or stabbed him himself.

■ We do not ordinarily review lawyers' tactical choices, *United States v. Dyer*, 784 F.2d 812, 817 (7th Cir.1986), and must conduct any *Strickland* review without injecting hindsight. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Only the third reason Rodriguez' trial counsel gave at the post-conviction hearing, however, even suggests that the decision not to suppress might have been made for valid tactical reasons, and we think it is obvious that in a case like this one—with no murder weapon in evidence and only one witness naming the defendant as the murderer— even the most withering cross examination could not substitute for suppression. Rodriguez' defense could not have been compromised or hurt by a motion to suppress. Scarce if any advantage would have been gained if the motion had been denied, but a denial would not have put Rodriguez at any disadvantage either. Cross examination was still available. And this would not have been a minor motion on a side issue.

■ On the direct appeal, the Wisconsin Court of Appeals, while finding that Rodri-

guez had waived his objection, remarked that "[d]oubtless without the identification testimony, the quantity and quality of the evidence is insufficient to affirm Rodriguez's conviction." *Rodriguez v. Wisconsin*, 111 Wis.2d 701, 332 N.W.2d 312 (Wis. Ct.App.1983). We entirely agree with that assessment of the evidence. It follows, then, given the crucial importance of Ramos' testimony, and the substantial arguments for its exclusion, that the trial judge should have been asked to rule on its admissibility. Criminal defense lawyers should not preempt judges by making their own negative rulings on close motions concerning crucial testimony.[3]

■ It may not have been clear before trial that failing to move for suppression would be ineffective performance under *Strickland*. But certainly on these facts—after Detective Schreiber's description of the confrontation in the district attorney's office, see footnote 5 below; his testimony that he told Ramos "[Rodriguez] was at the scene of the crime"; and Ramos' testimony that she recognized Rodriguez in the district attorney's office "because I have seen pictures"—counsel, even under *Strickland*'s minimal standards for performance, should have made a motion to suppress. This should have been done either on the heels of Schreiber's testimony, or before or after Ramos', by asking that the jury be excused for an evidentiary hearing or inquiry, or even as late as at the close of the prosecution's case in chief.[4]

Counsel's decision to forego a motion to suppress was not a decision that " 'might be considered sound trial strategy,' " *Strickland*, 466 U.S. at 689, 104 S.Ct. at

2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)), or "the result of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. It was objectively unreasonable and outside "the wide range of professionally competent assistance." *Id.* Cf. *Saltys v. Adams*, 465 F.2d 1023, 1028 (2d Cir.1972).

### B. *Prejudice: The Admissibility of the Identification Testimony*

The fact that there was no motion to suppress does not necessarily undermine the jury's verdict. Though it may have been a close question, Ramos' testimony was probably admissible and its credibility and weight a matter for the jury. Defense counsel did subject Ramos to aggressive cross examination. The fact that the admissibility of her testimony was never challenged did not necessarily prejudice the outcome.

■ Since first recognizing due process challenges to identification testimony in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Supreme Court has developed a two-part inquiry to govern such challenges. See *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The defendant must prove that the challenged identification was preceded by unnecessarily suggestive police procedures. But unnecessary suggestiveness without more does not violate due process or otherwise require exclusion of later identification testimony. "[R]eliability is the linchpin in determining the admissibility of identification testimony," and testimony that, despite the corrupting in-

---

**3.** We most emphatically do not mean to suggest that in the name of effective assistance, criminal defense lawyers should move to suppress every statement by every witness the prosecution presents. Only evidence for which there are colorable grounds for exclusion should be targeted. Frivolous motions should not be brought. But a motion to suppress in this case would clearly not have been frivolous.

**4.** Wis.Stat. § 971.31(2) (1977) provides: "Except as provided ... defenses and objections based on the use of illegal means to secure evidence shall be raised before trial by motion or be deemed waived. *The court may, however, enter-*

*tain such motion at the trial,* in which case the defendant waives any jeopardy that may have attached. The motion to suppress evidence shall be so entertained with waiver of jeopardy when it appears that the defendant is surprised by the state's possession of such evidence." (Emphasis added). That section on its face authorizes trial courts to consider suppression motions at trial and, in *State v. Mosley*, 102 Wis.2d 636, 307 N.W.2d 200 (1981), the Wisconsin Supreme Court rejected the state's argument that the defense's objection to identification testimony, which was not made until the close of the state's case, had been waived.

fluence of prior suggestion, remains reliable under the totality of the circumstances, is still admissible. *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253.

There are, generally speaking, two kinds of identification testimony which raise suppression problems. Sometimes a witness is asked to identify the defendant in the courtroom, during trial. At other times the witness is asked to testify to having identified the defendant on an earlier occasion, before trial. Many witnesses, like Maria Ramos, are asked to do both. The measure of whether an in-court identification is or is not reliable despite an earlier, impermissibly suggestive (and usually, out-of-court) identification, is whether the suggestion connected with the earlier identification was so corrupting as to lead to "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The same standard, "with the deletion of 'irreparable,'" also serves when the issue is the admissibility of testimony as to the earlier identification. *Biggers,* 409 U.S. at 198, 93 S.Ct. at 375. In either instance, the factors to be considered in assessing reliability and the likelihood of misidentification include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382–383.

1. Suggestiveness: The Confrontation in the District Attorney's Office

■■■ Rodriguez bears the burden of proving undue suggestion. That puts him in something of a box. As there was no motion to suppress, there was no contemporary evidentiary hearing on the facts surrounding the identification in the district attorney's office, and one consequence is the near bareness of the record on that issue. Detective Schreiber's testimony at trial is the only substantial evidence of who was standing where and what was said to whom and his account is sketchy at best.[5] Basic facts that would almost certainly have been developed at a suppression hearing, and might have substantiated (or ruled out) a finding of undue suggestion, appear only as gaps in the record here.

■■■ We will assume for the purposes of analysis that the confrontation in the district attorney's office was unduly suggestive.[6] Notwithstanding, Ramos' identi-

---

**5.** Detective Schreiber testified that:

Maria Ramos was in Assistant District Attorney Klinkowitz' office, and Detective Sandoval had the defendant in the outer office of the District Attorney's Office.

Detective Sandoval was standing approximately the length of this courtroom away from Assistant District Attorney Klinkowitz' office. I stepped out in the hall to direct Detective Sandoval to bring the defendant into Mr. Klinkowitz' office at which time Detective Sandoval was standing with his back to me, and the defendant was standing alongside with his back toward me. I brought Maria Ramos to the District Attorney's Office and directed her attention to the front of the office. I asked her if she knew Detective Sandoval; she stated no. I asked her if she saw Detective Sandoval standing anywhere in the District Attorney's Office; she stated no, but stated that the man in the white shirt is Boogie. That man was identified as the defendant standing alongside of Detective Sandoval.

**6.** Neither the Supreme Court nor any panel of this circuit has ever tried to define the exact level of suggestiveness necessary to trigger a due process inquiry into reliability, and it would be a silly exercise. But see the D.C. Circuit's en banc opinion in *Clemons v. United States,* 408 F.2d 1230, 1245 n. 16 (1968), for a helpful checklist of the kinds of circumstances that are apt to create undue suggestion.

Showups, however, will almost always lead to undue suggestion. We have been clear about that at least since then Judge Stevens' opinion in *United States ex rel. Kirby v. Sturges,* 510 F.2d 397 (7th Cir.1975). But see *Kirby* at 408.

In this case, if the confrontation procedure used in the district attorney's office was not a showup—the state insists it wasn't—it was a close approximation. We do not know whether Rodriguez was handcuffed, how many men were in the room, whether his clothes made him stand out, or whether he was the only Mexican in the room at the time. Regardless, showing a witness a suspect even in a crowded office provides none of the guarantees lineups

fication testimony was sufficiently reliable to make it admissible. Moreover, Rodriguez has not demonstrated that a motion to suppress, accompanied by a hearing, would, more likely than not, have created a record warranting its exclusion.

## 2. Reliability

Maria Ramos was standing against a wall across the street from the fight that ended in Guzman's death and there was enough light for her to see clearly. She testified that she heard noise; she turned around; saw three men fighting; saw one person, whom she identified as Rodriguez, stab Guzman "two or three times"; saw Rodriguez hold Guzman while Edgar Alicea stabbed him and then saw Rodriguez and the third man, whom she says was Edgar Alicea, leave; and saw Guzman clutch at his chest. She had an ample opportunity to view the struggle.

It is also clear that she was paying attention. She named Guzman and Edgar Alicea immediately afterwards, and her attention was fixed enough that she was able to describe a third person, whom she identified as the stabber, as a twenty-eight to twenty-nine-year-old short, fat, Spanish male wearing a green shirt. That description was certainly not "more than ordinarily thorough." *Biggers*, 409 U.S. at 200, 93 S.Ct. at 382 (calling a description which included "approximate age, height, weight, complexion, skin texture, build, and voice" not enough to "have satisfied Proust but ... more than ordinarily thorough."). Cf. *United States ex rel. Haywood v. O'Leary*, 827 F.2d 52, 60 (7th Cir.1987); *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1159 (7th Cir.1987); *United States v. Goodman*, 797 F.2d 468, 470-71 (7th Cir. 1986); *United States ex rel. Hudson v.*

*Brierton*, 699 F.2d 917, 925 (7th Cir.1983); *United States ex rel. Moore v. People of Illinois*, 577 F.2d 411, 414–15 (7th Cir. 1978). It would fit dozens of men in Milwaukee and elsewhere, and the fact that it offers no details as to facial features or other more distinguishing characteristics than age, build, and complexion is troubling. There is no physical description in the record for either Edgar or Edwin Alicea or Jake Navarro—the other men besides Rodriguez who were named by one witness or another as present at the scene—so we do not know whether the description fits any of them. Rodriguez, however, has not protested that it doesn't fit him, and we therefore assume, as the district court did, that it does. And that is a reassuring indicium of reliability of the identification, if not a conclusive one. There is also Detective Schreiber's testimony, from Detective Sandoval's report, that Ramos positively identified Rodriguez from a photo array even before the confrontation in the district attorney's office.

We are skeptical about equating certainty with reliability. "Determinations of the reliability suggested by a witness's certainty after the use of suggestive procedures are complicated by the possibility that the certainty may reflect the corrupting effect of the suggestive procedures [themselves]." *Kosik*, 814 F.2d at 1159. Also, the most certain witnesses are not invariably the most reliable ones. We consider certainty a relevant factor but consider it warily. Ramos made positive identifications of Rodriguez both in the district attorney's office and at trial, and the positive identification in the district attorney's office followed Guzman's death by only two days. But see *Manson*, 432 U.S. at 131, 97

---

are designed to afford. We hesitate to expressly hold that this back-view identification was unnecessarily suggestive only because of Detective Schreiber's testimony that Ramos had already positively identified Rodriguez for Detective Sandoval. Cf. *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1155 n. 7 (7th Cir.1987).

Control of police procedures for securing witness identifications is a job for branches of state government, not federal courts. But we repeat now what we said in *Kirby*. Some form of control, even an exclusionary rule for showups,

would be "desirable." *Kirby*, 510 F.2d at 409. See also ALI, Model Code of Pre–Arraignment Procedure § 160 (1975).

We note, with distress, that we continue to review cases both of showups, see *United States ex rel. Lee v. Flannigan*, 884 F.2d 945 (7th Cir. 1989); *Walton v. Lane*, 852 F.2d 268 (7th Cir. 1988), *United States ex rel. Hudson v. Brierton*, 699 F.2d 917 (7th Cir.1983), and other suggestive police procedures. In few of these cases do we ever find an explanation, by the prosecution, for the failure to conduct a lineup.

S.Ct. at 2261 (Marshall, J., dissenting) ("[T]he greatest memory loss occurs within hours after an event.")

Against these factors bearing on reliability, we weigh the evidence of prior and corrupting suggestions. That evidence includes Detective Schreiber's testimony describing the confrontation in the district attorney's office, a confrontation which we have presumed suggestive and which assuredly did not provide the safeguards of a lineup; his testimony that after a photo session at which Ramos picked out Rodriguez' photo and before the confrontation at which she clearly made a positive identification he told her "[Rodriguez] was at the scene of the crime on 2/14/76, at approximately 9:05 p.m."; and Maria Ramos' testimony that she recognized Rodriguez in the district attorney's office "because I have seen pictures." Considering that evidence in its entirety, we conclude that it does not so undercut the reliability of either the identification in the district attorney's office or the one in court that either one or both should have been suppressed. The procedures leading up to these identifications did not, under the totality of the circumstances, create "a very substantial likelihood" that Ramos would misidentify Rodriguez at the time or irreparably taint the possibility of later in-court identifications, such as the one she gave at trial. This does not mean that Ramos' identification testimony was necessarily accurate, only that it was admissible. Whether it was accurate as well as admissible was a question for the finder of fact. But both identifications manifested sufficient indicia of reliability to warrant letting the jury decide what weight to give them. Cf. *Kosik*, 814 F.2d at 1151.

There was no constitutional error in admitting Ramos' testimony, and the evidence in the case as a whole, while not overwhelming, was sufficient to support a conviction.

## C. *Miscarriage of Justice*

■ We cannot say that allowing Ramos to give identification testimony "precluded the development of true facts or resulted in the admission of false ones," *Smith v. Murray*, 477 U.S. at 538, 106 S.Ct. at 2668, or that letting the jury consider her testimony so perverted its deliberations concerning the ultimate question of guilt or innocence as to result in the "fundamentally unjust incarceration" of one who is "actually innocent." *Carrier*, 477 U.S. at 495–96, 106 S.Ct. at 2649–50; *Coleman v. O'Leary*, 845 F.2d 696, 703 (7th Cir.1988); *Williams v. Lane*, 826 F.2d 654, 664 (7th Cir.1987).

## III. JURY INSTRUCTIONS

### A. *Wisconsin Criminal Jury Instruction Number 1100*

■ At the close of the evidence, the jury was instructed that:

> [W]here there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all of the natural, probable and usual consequences of his deliberate acts.

Rodriguez levels two arguments at that instruction, former Wisconsin Criminal Jury Instruction Number 1100. First, he says its use is a violation of due process, and self-evidently so after *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), because it shifts the burden of proof to the defendant on the issue of intent. See *Francis*, 471 U.S. 307, 105 S.Ct. 1965; and *Sandstrom v. Montana*, 442 U.S. 510, 520–24, 99 S.Ct. 2450, 2457–59, 61 L.Ed.2d 39 (1979).

The district court did not reach the merits of that argument. This is the second habeas petition in which Rodriguez has challenged instruction 1100 on these due process grounds. The first time round, the district court denied relief on the authority of *Sandstrom* and *Pigee v. Israel*, 670 F.2d 690 (7th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 103, 74 L.Ed.2d 93 (1982). This time round, the district court dismissed the argument as an attempt to relitigate an issue already addressed on the merits and an abuse of the writ, rejecting Rodriguez' suggestion that *Francis*, coming after *Sandstrom*, represented an "intervening change in the law" sufficient to entitle

Rodriguez to a second chance. *Jacks v. Duckworth*, 857 F.2d 394, 399 (7th Cir. 1988). The district court pointed out that the battle over the impact of *Francis* on Wisconsin 1100 has been waged in this circuit before and lost. We have upheld the constitutionality of Wisconsin 1100 against due process attacks three times and twice since *Francis*.[7] Rodriguez was not blind to those precedents. He urges that they should be overruled and, to that end, presents arguments not addressed in our earlier opinions. He also directs our attention to what he regards as a split between this circuit and others, which our opinions have not mentioned.[8]

Rodriguez' second argument is that, besides shifting the burden of proof on the issue of intent, Wisconsin 1100 also shifts the burden of production, thereby effectively directing a verdict on intent and trespassing on defendants' sixth amendment rights to a jury trial. This is a new ground, which he did not raise in his first habeas petition. The district court dismissed it, too, as an abuse of the writ, citing *Sanders v. United States*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963): "[I]f a prisoner deliberately withholds one of the two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings ... he may be deemed to have waived his right to a hearing on the second application presenting the withheld ground." [9]

7. See *Fencl v. Abrahamson*, 841 F.2d 760, 770 (1988); *Dean v. Young*, 777 F.2d 1239, 1244 (1985), *cert. denied*, 475 U.S. 1142, 106 S.Ct. 1794, 90 L.Ed.2d 339 (1986) (upholding the constitutionality of Wisconsin 1100, *Francis* notwithstanding, but noting that "The Court continues to review similar instructions.... The Wisconsin instruction may or may not receive the approbation of the Supreme Court; certainly it presses if it does not exceed the wavering boundary staked out in the Court's cases); *Pigee v. Israel*, 670 F.2d 690, *cert. denied*, 459 U.S. 846, 103 S.Ct. 103, 74 L.Ed.2d 93 (1982).

8. The instruction in *Francis* was that "A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted." The Tenth Circuit has read *Francis* to forbid an instruction which provided: "There is the presumption that a person intends all of the natural and probable consequences of his voluntary acts. This presumption is overcome if you are persuaded by the evidence that the contrary is true." See *Wiley v. Rayl*, 767 F.2d 679, 681 (1985). *Wiley* also overruled *Hux v. Murphy*, 733 F.2d 737 (10th Cir.1984), which had upheld an Oklahoma judge's instruction to the jury that there is a "legal presumption that one intends the obvious and natural consequences of his acts, unless the contrary is shown." See *Wiley*, 767 F.2d at 681 n. 2. The Eleventh Circuit has read *Francis* to forbid an instruction which provided: "I charge you that the acts of a person of sound mind and discretion are presumed to be the products of a person's will and a person of sound mind and discretion is presumed to intend the natural and probable consequences of his act, but both of these presumptions may be rebutted." See *Drake v. Kemp*, 762 F.2d 1449, 1453 (11th Cir.1985) (en banc). Rodriguez argues that these instructions are indistinguishable from Wisconsin 1100.

9. After Rodriguez filed this second habeas petition, listing nine grounds for relief, the State moved for summary judgment. The district court granted the motion as to Rodriguez' argument that Wisconsin 1100 offends due process, finding that, as described above, that argument had already been rejected on the merits by the order denying Rodriguez' first petition, but ruled that summary judgment was inappropriate as to the "seven new and different grounds in this petition that he [Rodriguez] failed to raise in his first petition" and that by arguing those seven grounds, Rodriguez was not abusing the writ by "misusing or subverting the judicial process with needless piecemeal litigation." Rodriguez argues that "for inexplicable reasons" the district court then reversed itself—that having denominated his sixth amendment argument one of the "new" grounds on summary judgment, deserving of a decision on the merits, the court subsequently reneged on that ruling, in its final opinion, by nevertheless dismissing the sixth amendment argument as an abuse of the writ and refusing to reach the merits. More likely, the district court simply overlooked the sixth amendment argument on summary judgment. "Seven new and different grounds" plus the previously rejected due process argument, as to which summary judgment was granted, adds up to only eight grounds total. The district court apparently missed the ninth ground—the sixth amendment argument—on first pass. Upon discovering its oversight while writing the final opinion, the court then corrected for it. There's nothing "inexplicable" here. The district court's final opinion does, as the earlier summary judgment decision said it would, address all seven of what Judge Warren always regarded as the seven new grounds and addresses them on the merits.

Whatever the merits of either a renewed due process challenge or a sixth amendment challenge to Wisconsin 1100 might be in another context, they are unavailing arguments for Rodriguez. The giving of a *Sandstrom* instruction, shifting the burden of proof on intent, may be harmless error, *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), and is if "the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same." *Pope v. Illinois*, 481 U.S. 497, 503 n. 6, 107 S.Ct. 1918, 1922 n. 6, 95 L.Ed.2d 439 (1987); *Rose*, 478 U.S. at 583, 106 S.Ct. at 3109.

In Rodriguez' case, any error propounded when Wisconsin 1100 was read to the jury was assuredly harmless. The hot question at trial was whether Ramos' testimony should be believed. Was Rodriguez the one? Hardly surprisingly, Rodriguez (who testified at trial) did not argue that although he stabbed Guzman he did not intend to. He simply denied doing it. Mens rea was never an issue. The government did not offer direct evidence of intent, but juries are free to infer intent from conduct. In the many cases where there is no direct evidence of intent, that is exactly how intent is established. See *Rose*, 478 U.S. at 580–81, 106 S.Ct. at 3107–08. To convict in this case, the jury had to believe Ramos' testimony that Rodriguez stabbed Guzman "two or three times." Once it believed that, the inference of intent had to be overpowering. The 1100 instruction was irrelevant but not prejudicial.

### B. *Rodriguez' Proposed Theory of Defense Instruction*

Rodriguez asked for a theory of defense instruction. The trial judge responded that he would not give one without also giving "the theory of prosecution in order to be fair to both sides." Rodriguez balked at that condition and argues that the trial judge violated his rights to due process by imposing it.

 Even if a theory of defense instruction is outright refused, and not just conditioned on giving a parallel instruction

for the prosecution, the issue on collateral review is narrow. There is only reversible error if the result was the denial of a fair trial, *United States v. Douglas*, 818 F.2d 1317, 1322 (7th Cir.1987); *United States v. Boucher*, 796 F.2d 972, 976 (7th Cir.1986), and in assessing whether the trial was fair we examine the entire jury charge in the context of the entire trial, *United States v. Bailey*, 859 F.2d 1265, 1277 (7th Cir.1988), recognizing that Rodriguez was not entitled to have any particular instruction presented to the jury but only to have his theory put before them. *Douglas*, 818 F.2d at 1320.

 Rodriguez mounted his defense by challenging Ramos' credibility and the reliability of her identification testimony. In his cross examination of Ramos, his lawyer very effectively drilled home the notion that Ramos was lying and had been primed by the police to name Rodriguez, and he planted that suggestion again in his closing argument. In addition, the instructions finally given to the jury adequately addressed that same theory in a general way, even if not as specifically as Rodriguez would have liked. The trial judge instructed the jury, in part, that:

> ... as to the question of identification, in this case the defendant has challenged the question of the identity of the person or persons who committed the crime.

> If you find that the crime of murder in the first degree was committed, before you may find the defendant guilty of that crime, you must be satisfied beyond a reasonable doubt that the defendant, Jose Cruz Rodriguez, was the person who actually committed it.

A mere presence instruction was also given, and the jury was properly instructed as to its sole responsibility for judging the credibility of the witnesses. Those instructions, considered together, and along with counsel's argument and cross examination of Ramos, should have reasonably conveyed to the jury Rodriguez' theory of the case. Any prejudice prompted by the judge's conditioning of a theory of defense instruction on the giving of a parallel instruction for the prosecution was not so great as to amount to a deprivation of due process.

## IV. RODRIGUEZ' REMAINING CLAIMS

As a tag end, Rodriguez presses a pair of *Strickland* claims in addition to his chief claim that counsel failed him by not bringing a motion to suppress. These are: (1) that he was denied the effective assistance of counsel when his lawyer did not act on his request for a polygraph examination and (2) that he suffered a similar deprivation when his lawyer did not insist on verbatim translations of passages of Ramos' testimony. He also argues that the lack of verbatim translations meant he was denied the right to confront and cross examine Ramos. He has not identified any specific instance of prejudice connected to mistranslated or untranslated statements, and he certainly has not shown either that he would have passed a polygraph exam or, more importantly, that this case would have been dismissed if he had. All three of these tag end arguments are meritless.

## V. CONCLUSION

The opinion of the district court is affirmed.