* A motion for waiver of oral argument was granted in this case, and therefore it is being submit-

The case is REMANDED to the NLRB for action consistent with this opinion.

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ernest Frank CLARK and Eric Griffin,
Defendants–Appellants.**

**Nos. 92–1893, 92–1915.**

United States Court of Appeals,
Seventh Circuit.

Submitted Sept. 29, 1992.*

Decided March 25, 1993.

As Amended May 7, 1993.

ted for decision on the basis of the briefs and record.

Lynne M. Solien, Office of the U.S. Atty., Milwaukee, WI, for U.S.

Michael J. Steinle, Milwaukee, WI, for Eric Griffin.

Gregory G.H. Rihn, Poulos, Sengstock & Budny, West Allis, WI, for Ernest F. Clark.

Before RIPPLE and KANNE, Circuit Judges, and LEINENWEBER, District Judge.[**]

KANNE, Circuit Judge.

The Tri–City National Bank, located at 7213 North Teutonia Avenue in Milwaukee, Wisconsin, was robbed at approximately 11:38 a.m. on November 19, 1991. The robber wore a baseball cap, a sweater, baggy pants, black and white high-top tennis shoes, glasses, and had a bandanna over his nose and mouth. After entering the bank, he jumped onto a teller's counter and pointed a silver plated gun at bank employee Rebecca Reifenstuhl. The robber proceeded over the teller's window and asked teller Sandra Kimbrough where the money

[**] The Honorable Harry D. Leinenweber, District Judge for the Northern District of Illinois, is sitting by designation.

was. After she gestured to her drawer, the robber removed money from the drawer and Ms. Kimbrough's hands. The robber also instructed head teller Rae Rogowski to get him money from the drive-up window. Ms. Rogowski complied and placed the money in the robber's bag. The robber then leapt over the teller window and ran out of the bank. As the robber left the bank, he stuffed the bag under his sweater and headed in a southwesterly direction toward an alley located behind the Sentry store at the corner of Teutonia Avenue and Good Hope Road.

The entire robbery lasted approximately two minutes. It was later determined that $11,180.00 had been taken, $200.00 of it in marked five-dollar bills known as "bait bills."

Prior to the robbery, Mr. Baumann, a postal carrier, was eating lunch in his truck in the alley between the Sentry store and an apartment complex. During his lunch, he noticed a black Cadillac, with a black male driver, parked at the apartment complex. Three to five minutes later, the black Cadillac started creeping down the alley. Mr. Baumann monitored the Cadillac's movements because he found them strange and was concerned for his vehicle's safety. The Cadillac eventually passed him, still containing only one black male.

Shortly thereafter, Mr. Baumann heard a commotion, looked up, and saw a black male run by him after the Cadillac. According to Mr. Baumann, the man looked "like a football player holding his arms over his stomach." A few seconds later, Mr. Baumann glanced in his side rearview mirror and saw the black Cadillac pull away with two people in it. Suspicious, Mr. Baumann wrote down the license plate of the Cadillac on the newspaper he was reading.

Subsequently, police arrived at the scene and Mr. Baumann gave them the car's license plate number. The license plate number and the Cadillac's description were broadcast to local police by the dispatcher. Officer Susan Black heard the broadcast and, approximately fifteen minutes later, spotted a car fitting the description parked a few blocks from the bank at 6873 North Teutonia Avenue. After finding the car unoccupied, Officer Black spoke with Robert Malvick, who was working in a nearby alley.

Mr. Malvick claimed that he had seen a twenty to thirty-year old black male, wearing a long black coat, exit the Cadillac and run into the apartment building at 6873 Teutonia Avenue. Within minutes, Officer Black and another officer sealed off the apartment building and no one entered or left the building after their arrival. Other officers arrived and together they searched the building for suspects.

Eventually the officers knocked on the door of apartment number four. Gloria Clark answered the door and claimed she was alone, but granted the police permission to search her apartment. Upon entering the apartment, Officer Kozich noticed a long black coat fitting Mr. Malvick's description. Moments after the officers' entry, Eric Griffin appeared and was arrested. Further searching revealed Ernest Clark, Ms. Clark's brother, hiding in a bedroom closet. When he was arrested, Mr. Clark was wearing gray slacks, black and white high-top sneakers and was without a shirt. He had $3,870 in his pants pockets. In addition, officers found a .32 automatic chrome plated loaded handgun in the closet where he was hiding.

A complete search of the apartment revealed more incriminating evidence: $5,949 in a paper bag in the refrigerator—including 79 five-dollar bait bills from Tri–City National—$1,141 tucked in a planter, 63 grams of cocaine in a purse on the balcony and 4 revolvers. Inside the long black coat, the officers found the keys to the black Cadillac. A search of the black Cadillac produced a brown scarf, a white Nike baseball cap and a pair of glasses.

Following their arrests, Mr. Clark and Mr. Griffin were taken back to the Tri–City National Bank. Less than ninety minutes had elapsed since the robbery, and Mr. Clark was still not wearing a shirt. While standing outside the Bank, handcuffed and flanked by police officers, both defendants were viewed by the six bank employees.

The witnesses were brought out one at a time to view the defendants and were instructed not to talk to fellow employees during the identification process. None of the employees recognized Mr. Griffin. Three witnesses positively identified Mr. Clark as the robber, and the other three tentatively identified him.

At trial, Mr. Baumann, Mr. Malvick, Ms. Clark, as well as the three bank employees who identified Ernest Clark, testified for the government. Ms. Clark testified that she had met Eric Griffin, her brother's friend, once before, approximately a week before the robbery, when he had driven her brother to her apartment in a black four door sedan. During that visit, her brother asked her many questions about the Tri–City National Bank, including whether many people worked there during the morning hours. Ms. Clark testified that she told her brother that she knew little about the bank and that he had better not try anything.

According to Ms. Clark, sometime between 11:00 a.m. and noon on the day of the robbery, Eric Griffin, wearing a long black coat, knocked on her door and asked to use the telephone. Ms. Clark let him in and returned to her bedroom. Soon after, her brother rushed into the apartment wearing a grayish white sweater and gray-blue pants. Ms. Clark and Mr. Griffin followed Mr. Clark into a bedroom where he pulled a bag out from under his sweater and dumped money from it all over the bed. Ms. Clark asked her brother where the money came from, and he referred to their conversation of the previous week about Tri–City National Bank, adding that the money had come from there.

At that time, a telephone call from a neighbor alerted Ms. Clark to the fact that the police were outside the apartment building and she relayed this information to the defendants. The two men started grabbing money and stuffing it into drawers and other hiding places. Ms. Clark testified that when the officers came to her door, she believed that the two men had climbed out the back door and that she was alone. As mentioned, she was not alone and the defendants were arrested in her apartment.

At trial, Mr. Clark departed from his initial plan and took the stand. He denied any involvement in the robbery. Mr. Griffin presented an alibi witness but did not take the stand. At the close of the three-day jury trial, both defendants were convicted of armed bank robbery in violation of 18 U.S.C. § 2113(a), (d), & § 2, and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(e). Mr. Clark was also convicted of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Following sentencing, both defendants filed timely appeals.

The defendants present four objections to their convictions. Mr. Clark argues that the trial court erred in not suppressing the identification testimony of the bank employees. Mr. Griffin claims that the trial court erred in not granting his motion in limine regarding a portion of Gloria Clark's testimony that allegedly violated his Confrontation Clause rights. Mr. Griffin also argues that the trial court erred in not granting his motion to sever his trial from Mr. Clark's. Finally, Mr. Griffin claims that there was insufficient evidence at trial to sustain his conviction. Finding none of the defendants' arguments persuasive, we affirm both convictions.

## I. Identification Testimony

■ Mr. Clark argues that the identification testimony of the bank employees should not have been admitted at his trial.[1] In order to succeed, the defendant must meet the two part test identified in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). First, the defendant must demonstrate that the identification was the result of unnecessarily suggestive

1. Mr. Clark's brief objects merely to the testimony regarding the pretrial identification procedure held at the bank immediately after the robbery. For purposes of this appeal, we assume that Mr. Clark also objects to the in-court identifications made by the same witnesses under the fruit of the poison tree doctrine. *See United States ex rel. Hudson v. Brierton*, 699 F.2d 917, 923 (7th Cir.), *cert. denied*, 464 U.S. 833, 104 S.Ct. 114, 78 L.Ed.2d 115 (1983).

police procedures. *Rodriguez v. Young*, 906 F.2d 1153, 1161 (7th Cir.1990), *cert. denied*, 498 U.S. 1035, 111 S.Ct. 698, 112 L.Ed.2d 688 (1991). Second, the defendant must prove that, given the totality of the circumstances, the corrupting influence of prior suggestion has rendered the identification testimony unreliable. *Id.* at 1161–62. "The Supreme Court has explained that, 'the primary evil to be avoided is a very substantial likelihood of irreparable misidentification.'" *United States v. Donaldson*, 978 F.2d 381, 385 (7th Cir.1992). Mr. Clark argues that he has met both prongs of this test. We do not agree.

■ As recounted above, both Mr. Clark and Mr. Griffin were brought to the bank within an hour and a half of the robbery. Both men stood outside the bank window, handcuffed and flanked by police, while the bank employees viewed them and made their identifications. The police told bank employees that they had suspects in custody but did not comment on the guilt or innocence of those suspects. Mr. Clark argues that this procedure amounted to a showup and was unduly suggestive. Further, he claims the suggestiveness of the procedure was aggravated because the witnesses viewed him shirtless on a cold November day. While this procedure is not exactly a showup since two suspects were viewed, we agree with defendant Clark that it was more like a showup than a lineup.[2]

■ We recognize that showups are proper and not unduly suggestive under certain circumstances. *See United States v. Watson*, 587 F.2d 365, 367 (7th Cir.1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979). *See also Johnson v. Dugger*, 817 F.2d 726 (11th Cir.1987); *United States v. Kessler*, 692 F.2d 584 (9th Cir.1982). For purposes of our analysis, however, we will assume, without deciding,

that the procedure in this case was unduly suggestive. Hence, our inquiry becomes whether the identification remains reliable and thus admissible under the totality of the circumstances. *Rodriguez*, 906 F.2d at 1162. In answering this question, we consider the following:

> The opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting influence of the suggestive identification itself.

*Manson*, 432 U.S. at 114, 97 S.Ct. at 2253.

We note that our reliability determination is limited. "[W]e determine here only whether the entire evidence regarding these identifications afforded them sufficient reliability to reach the jury despite any undue suggestiveness...." *U.S. ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1156 (7th Cir.1987). Keeping in mind the limits of our review, we examine the *Manson* factors in light of the facts of this case.

■ First, did the bank witnesses have sufficient opportunity to view the robber while he was committing the offense? The record indicates that an adequate opportunity existed. Although the robbery lasted less than two minutes, it occurred during daylight hours and the employees who identified the robber were near him.[3] In *Napoli*, we held that witnesses had ample opportunity to view occupants of a car even though the entire incident took place at night and lasted less than two minutes. 814 F.2d at 1154–57. Likewise, in this case, the witnesses had an opportunity, albeit not an lengthy one, "to obtain a definite impression of the individual's appear-

---

**2.** A true showup occurs when only one suspect is presented to witnesses. In this case, the witnesses were presented with the opportunity to identify someone other than Mr. Clark. We cannot tell from the record whether this possibility was at all likely because it is not clear that Mr. Griffin and Mr. Clark were at all similar in appearance. Absent such a showing, we con-

clude that the procedure more closely resembled a showup than a lineup.

**3.** Rebecca Reifenstuhl testified that she was close enough to the robber to touch him. Sandra Kimbrough testified that she was within two feet of the robber, and William Zick testified that he was within fifteen feet of him.

ance." *Id.* at 1157. *See also Walton v. Lane,* 852 F.2d 268, 273 (7th Cir.1988) (since robbery took place during daylight, actual exposure time was less critical); *Brierton,* 699 F.2d at 925 (ten to fifteen seconds could provide adequate time to form a mental image).

Second, did the identifying witnesses pay close attention to the robber for later identification purposes? We conclude they did. All the bank employees had been trained to formulate descriptions of robbers, and one witness had experienced three prior bank robberies. Another witness testified that she made herself calm down and concentrate on the robber so she could identify him later; she even wrote down her description immediately following the robbery, before the police arrived. Thus, this factor strongly supports a finding of reliability. *See Watson,* 587 F.2d at 365 (holding that the degree of attention supported finding the identification reliable because the witness was an experienced bank teller with special identification training).

Third, did the witnesses provide the police with accurate descriptions of Mr. Clark prior to the showup? We believe the bank employees' initial descriptions bolster the reliability of the later identifications. Mr. Zick described the robber as a 25 to 30 year-old black male, about 175 to 180 pounds, wearing dark pants, a white striped top, a white baseball cap, glasses, a brown bandanna over his face, and white and black tennis shoes. Ms. Reifenstuhl testified that the robber was wearing a gray and white baseball cap, glasses, a brown scarf over his face, a gray and white sweater, gray pants, and black and white high-top tennis shoes. She also testified that the back of the robber's hair looked braided. Ms. Kimbrough testified that the robber was wearing khaki pants, black and white tennis shoes, had a scarf over his face, and that she particularly remembered his eyes.

Mr. Clark contends that the discrepancies between the witnesses' descriptions indicate that the witnesses placed disproportionate emphasis on the robber's shoes when making their later identifications.

We disagree. The differences between the witnesses' initial descriptions are minor. Moreover, the witnesses did not base their later identifications solely on the tennis shoes. They also relied on the robber's body shape, hair and eyes. We will not use the fact that the witnesses clearly remembered the robber's shoes, which were conspicuously visible when he jumped on the teller's counter, to discredit their identifications.

The argument is made that the witnesses' later identifications were unreliable because their initial descriptions of the robber were too general and could have fit many black men with high-top tennis shoes. We rejected a similar assertion in *Rodriguez.* In that case, the witness described the suspect as a 28 or 29 year-old, fat, short Spanish male wearing a green shirt. 906 F.2d at 1163. We concluded the following about the reliability of the description:

> It would fit dozens of men in Milwaukee and elsewhere, and the fact that it offers no details as to facial features or other more distinguishing characteristics than age, build, and complexion is troubling.... Rodriguez, however, has not protested that it doesn't fit him, and we therefore assume, as the district court did, that it does. And that is a reassuring indicium of reliability of the identification, if not a conclusive one.

*Id.* In *United States v. Flannigan,* 884 F.2d 945 (7th Cir.1989), *cert. denied,* 497 U.S. 1027, 110 S.Ct. 3277, 111 L.Ed.2d 786 (1990), the victim gave a similarly generic description of his attacker. The assailant was described as a slender white 18 year-old male, between 5'10" and 6' tall with long blond hair. *Id.* at 949. We concluded that the description accurately depicted the culprit, and thus the later identification was reliable. *Id.*

In the instant case, there is no evidence or argument that Mr. Clark does not fit the witnesses' initial descriptions, so we assume he does. In addition, we have even more reason to feel assured that the later identifications were reliable than in the aforementioned cases. Here, the bank witnesses' descriptions were somewhat more thorough, and the suspect was viewed within two hours of the robbery. Because

the witnesses accurately described Mr. Clark before the showup, we conclude that this factor supports the reliability of the identifications.

Fourth, how certain were the bank employees regarding their identifications? We are mindful that "the most certain witnesses are not invariably the most reliable ones," since their certainty may result from the suggestive procedure. *Rodriguez*, 906 F.2d at 1163. However, we do note that the three identifying witnesses were unwavering in their initial descriptions and later identifications of Mr. Clark as the robber. Mr. Clark argues that the fact that three other bank employees could make only tentative identifications casts doubt on the reliability and certainty of the other three witnesses. We disagree. If anything, the fact that the three other employees were uncertain supports a conclusion that the procedure was not as suggestive as the defendant would have us believe. Hence, we believe that the witnesses' certainty supports the reliability of the later identifications.

Fifth, how much time passed between the commission of the crime and the suspect's confrontation with the witnesses? A very short period of time elapsed between the robbery and the identification procedure—approximately ninety minutes. We have held that identifications were reliable despite greater lapses of time. *See Rodriguez*, 906 F.2d at 1163 (two days); *Flannigan*, 884 F.2d at 950 (five days); *Napoli*, 814 F.2d at 1160–61 (one month); *Brierton*, 699 F.2d at 925 (few hours); *Watson*, 587 F.2d at 367 (two hours); *Jones v. Wisconsin*, 562 F.2d 440, 442 (7th Cir.1977) (one week). Thus, we conclude that the time factor strongly supports the reliability of the later identifications.

Weighing these factors that support the reliability of the identifications against the potentially corrupting influence of the showup procedure, we hold that the district court did not err in refusing to suppress the identification testimony of the three bank witnesses.

## II.  Confrontation Clause

■ Mr. Griffin argues that Gloria Clark's testimony regarding an admission made by Mr. Clark violated his constitutional right to confront witnesses. Mr. Griffin relies on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), in which the Supreme Court held that admitting a nontestifying defendant's confession which incriminated both defendants violated the Confrontation Clause.

An examination of Ms. Clark's challenged testimony and subsequent events at trial is necessary to resolve the issue Mr. Griffin has raised. Following her brother's arrest, Ms. Clark told the police that while he and Mr. Griffin were counting money on her daughter's bed, she asked her brother where he got the money. According to Ms. Clark, her brother replied, "You remember what we talked about the other day, well we did it." [4] Prior to trial, Mr. Griffin moved to have the statement excluded from evidence as well as for severance of trials. The trial court concluded that a *Bruton* problem did exist, but that the problem could be resolved by restricting Ms. Clark's testimony.[5] During direct examination, the government carefully led Ms. Clark in order to elicit Mr. Clark's incriminating statement without directly implicating Mr. Griffin. After Ms. Clark testified that Mr. Clark had come into her apartment, sat on her daughter's bed and pulled a bag out from under his sweater, the following exchange occurred between the Assistant United States Attorney and Ms. Clark:

Q  And what did he do with the bag?
A  Dumped it out, pulled the bag out and he dumped it over the bed and money came out of the bag.
Q  How much money?
A  Lots of money.
Q  Where was Eric?
A  He was sitting on the other end of the bed.

---

**4.** Another police report indicates that Ms. Clark said her brother replied, "Remember what I was talking to you about last week? We did it, we robbed the bank."

**5.** The trial court did not specifically rule on Mr. Griffin's motions. However, its decision to allow the restricted testimony had the practical effect of denying both motions.

Q You asked your brother where the money came from, right?

A Um-hum. Yes.

Q And your brother said from the bank, right?

A Yes.

Q And he also said that it was what you and he had talked about last week, right?

A Yes.

Q And what was that?

A He, we was talking about Tri–City National.

Q And the next thing that happened was that the phone rang, right?

A Um-hum.

Following this testimony, Ms. Clark resumed her own narration of the events.

Later, after Ms. Clark had testified, Mr. Clark decided to take the stand and testify on his own behalf. The government sought to have the unrestricted version of Mr. Clark's statement introduced into evidence. The trial court deferred a ruling until after Mr. Clark's testimony was heard. On the stand, Mr. Clark denied involvement in the robbery. More specifically, Mr. Clark denied ever speaking to his sister about Tri–City National Bank:

Q Did you ever at anytime prior to November 19th of 1991 discuss with your sister whether there was good security at this Tri–City Bank branch or anything that might lead her believe that you were planning to rob the bank?

A No.

The government did not specifically address this portion of Mr. Clark's testimony during cross-examination. Counsel for Mr. Griffin did not question Mr. Clark at all. The issue of whether the full unrestricted testimony was admissible never arose again during the trial.

With this background we address whether Ms. Clark's testimony violated Mr. Griffin's Confrontation Clause rights. According to the Supreme Court, "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *Nelson v. O'Neil*, 402 U.S.

622, 626, 91 S.Ct. 1723, 1726, 29 L.Ed.2d 222 (1971) (citations omitted). Thus, Mr. Griffin's reliance on *Bruton* is misplaced. As long as Mr. Clark was available at trial for full and effective cross-examination, Mr. Griffin's Confrontation Clause rights were not violated.

A review of the record and relevant legal authority has convinced us that Mr. Clark was available for full and effective cross-examination. In *O'Neil*, the declarant took the witness stand and testified "fully as to his activities during the period described in his alleged out-of-court statement," but denied making the out-of-court statement which implicated his codefendant. *Id.* at 627, 91 S.Ct. at 1726. The Supreme Court reasoned that the declarant's testimony denying the statement was more beneficial to his codefendant than any cross-examination of the declarant would have been if he had affirmed the statement. *Id.* at 629, 91 S.Ct. at 1727. The Court concluded that the declarant's codefendant's Confrontation Clause rights had not been violated. *Id.*

The facts in this case are very similar to those in *O'Neil.* Mr. Clark testified about his activities on the day of the bank robbery and denied having any conversation with his sister regarding the Tri–City Bank. Although he did not specifically deny telling his sister that the money came from the bank, such a denial was implicit in his denial of *any* conversation about the bank and his claim that the money was the result of gambling winnings. Therefore, as a practical matter, Mr. Griffin's counsel could have cross-examined Mr. Clark about the statement he allegedly made to his sister following the robbery.

The fact that counsel for Mr. Griffin chose not to cross-examine Mr. Clark once he denied involvement in the robbery does not mean that Mr. Clark was unavailable for cross-examination; it merely shows that counsel made a tactical decision to let Mr. Clark's denial stand. Therefore, we hold that any potential problem with Ms. Clark's testimony was eliminated by Mr. Clark's testimony and, thus, Mr. Griffin's Confrontation Clause rights were not violated. *See United States v. Myers*, 892 F.2d 642, 645 (7th Cir.1990) (defendant's

Confrontation Clause rights not violated since declarant/codefendant took the stand). *Cf. United States v. Chrismon,* 965 F.2d 1465, 1468–69 (7th Cir.1992) (no *Bruton* problem existed when declarant took stand and repeated out-of-court statement).[6]

### III. Severance

▮▮ Mr. Griffin argues that the trial court erred in refusing to sever his trial from Mr. Clark's trial. The defendant acknowledges that a joint trial of coconspirators who are jointly indicted is presumptively appropriate. *United States v. Caliendo,* 910 F.2d 429, 437 (7th Cir.1990). The decision whether to grant a severance motion is left to the sound discretion of the trial court. *Id.* On appeal, "a defendant wishing to successfully challenge a district court's denial of [his] motion for severance must show 'actual prejudice'—that is, the defendant must show that [he] could not possibly have a fair trial without a severance." *Id.* In *United States v. Oglesby,* 764 F.2d 1273, 1276 (7th Cir.1985), we outlined four circumstances in which actual prejudice might result: (1) conflicting and irreconcilable defenses; (2) a massive and complex amount of evidence that makes it almost impossible for the jury to separate evidence as to each defendant; (3) a codefendant's statement that incriminates the defendant; and (4) a gross disparity of evidence between the defendants. Mr. Griffin claims that two of these four circumstances exist in his case—an inculpatory codefendant statement and a gross disparity of evidence.

▮▮ First, Mr. Griffin argues that a separate trial was necessary to prevent him from being prejudiced by Ms. Clark's testimony about her brother's admission—an inculpatory statement by his codefendant. We determine whether the trial court abused its discretion in refusing to grant

severance by viewing the record at the time the motion was made. *Oglesby,* 764 F.2d at 1275. At the time Mr. Griffin moved for severance, he could not demonstrate that prejudice necessarily would result from the denial of his motion since a separate trial is not necessary to prevent a defendant from being prejudiced by testimony such as exists in this case. *Richardson v. Marsh,* 481 U.S. 200, 209, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987). The Supreme Court has held that redacting an incriminating written statement and giving a proper limiting instruction is an acceptable alternative to separate trials in such situations. *Id.*

> It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.

*Id.* at 210, 107 S.Ct. at 1708. *See also Zafiro v. United States,* —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993) (severance not mandatory because "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice"); *United States v. Strickland,* 935 F.2d 822, 825–26 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991) (severance not necessary if written statements are redacted); *United States v. Sophie,* 900 F.2d 1064, 1077 (7th Cir.), *cert. denied,* 498 U.S. 843, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990) (tape recorded statements not directly implicating defendant appropriately admitted with proper limiting instruction).

▮▮ Thus, the trial court had discretion to sever trials or confine the witness' testi-

---

**6.** We note that it is possible that no *Bruton* problem truly exists in this case. In *United States v. York,* 933 F.2d 1343, 1362–64 (7th Cir. 1991), and *United States v. Curry,* 977 F.2d 1042, 1055–56 (7th Cir.1992), we held that admitting statements which were admissible as statements against penal interest under FED.R.EVID. 804(b)(3) did not violate the defendants' Confrontation Clause rights. It appears that Mr.

Clark's statements to his sister would meet the requirements of Rule 804(b)(3), thus eliminating any *Bruton* concerns; however, the government did not raise this issue. Absent an argument by the parties and a determination by the district court on the admissibility of Mr. Clark's statements pursuant to Rule 804(b)(3), we decline to base our holding on this ground.

mony through leading questions and, where necessary, give a proper limiting instruction. As described above, Ms. Clark's testimony was appropriately restricted so that all the jury heard was that Mr. Clark said the money came from the bank; Mr. Griffin was not mentioned. However, no limiting instruction was requested or given.

As we have outlined above, *Richardson* approves of a joint trial when the damaging evidence is restricted and a proper limiting instruction is given. However, nothing in *Richardson* suggests that the trial judge must give a limiting instruction when the defendant does not ask for it. Mr. Griffin never requested such an instruction and never objected to the court not giving one. In such circumstances, the rule is that we will only review the trial court's omission for plain error. *Myers*, 892 F.2d at 645; *United States v. Dietrich*, 854 F.2d 1056, 1060 (7th Cir.1988). Unless we are convinced that the failure to give a limiting instruction resulted in a miscarriage of justice, there is no basis for reversal. *Id.* We cannot conclude that the absence of a limiting instruction constituted plain error. Giving such an instruction under these circumstances could have created a problem for the defendant by overemphasizing Ms. Clark's testimony.

We find further support for our conclusion in the fact that Ms. Clark's testimony regarding her brother's admission was far from the most damaging evidence against Mr. Griffin. Hence, because we do not believe that the jury's verdict would have been any different had the limiting instruction been given, we hold that the trial court properly refrained from giving a limiting instruction absent a request from the defendant. Moreover, because we have decided that the limiting instruction was not improperly omitted, we also conclude that Mr. Griffin has failed to demonstrate actual prejudice from his joint trial. Therefore, we hold that the trial court properly refused to grant Mr. Griffin's severance motion on the basis of Ms. Clark's testimony.

Second, Mr. Griffin argues that severance was mandated because of a gross disparity of adverse evidence as between Mr. Clark and himself. Mr. Griffin points out that he was not identified by any eyewitnesses, and claims that Ms. Clark's testimony was so incredible that no jury could reasonably believe her. In contrast, he notes that Mr. Clark was identified by three bank employees and was found in a closet with a large amount of cash and a gun. Thus, according to Mr. Griffin, he was prejudiced because his conviction was impermissibly based on the overwhelming evidence of Mr. Clark's guilt.

The fact that the government has greater evidence against one codefendant does not automatically give the other codefendant grounds for severance. *United States v. Studley*, 892 F.2d 518, 524 (7th Cir.1989). " 'In such situations, the relevant inquiry is whether it is within the jury's capacity to follow the trial court's limiting instructions requiring separate consideration for each defendant and the evidence admitted against [him].' " *Id.* Moreover, we presume that juries are capable of following instructions and reaching separate conclusions regarding each defendant. *United States v. Briscoe*, 896 F.2d 1476, 1517 (7th Cir.), *cert. denied*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990).

At trial, the district judge instructed the jury to consider the evidence as to each defendant separately:

[T]his is a joint trial, but you must give separate consideration to the evidence against each defendant and on each defendant as to each count you must decide whether the government has proven the defendant to be guilty as charged beyond a reasonable doubt.

After reviewing the record, we conclude that the evidence in this case was not so complicated that the jury would be unable to follow the court's instruction. We have refused to disturb denials of severance motions when the cases involved much more complicated evidentiary issues. *See United States v. Crockett*, 979 F.2d 1204 (7th Cir.1992) (two defendants charged with violating RICO and extortion laws were properly tried together); *United States v. Neely*, 980 F.2d 1074, 1077 (7th Cir.1992) (codefendants in eleven-week trial on mail fraud indictments involving 26 people not prejudiced by joint trial); *United States v. Cochran*, 955 F.2d 1116, 1119 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992) ("lookout" for drug deal

fairly tried with five other coconspirators); *Briscoe*, 896 F.2d at 1483 (appropriate to try drug courier jointly with fourteen other defendants in heroin trafficking case); *Studley*, 892 F.2d at 518 (two defendants charged with knowingly disposing of property pledged to the Farmers Home Administration were · properly tried together). Mr. Griffin has failed to demonstrate that the jury would be unable to follow the court's instruction in this case and so we must presume it did.·

Because Mr. Griffin has not shown that he was actually prejudiced by a joint trial with Mr. Clark, we hold that the trial court did not abuse its discretion in denying Mr. Griffin's severance motion.

### IV. Sufficiency of the Evidence

■ Finally, Mr. Griffin claims that his conviction rests on insufficient evidence of his guilt. "We will uphold the conviction if the evidence, when viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir.1992).

As mentioned, Mr. Griffin makes much of the fact that he was not identified by any eyewitnesses and claims that Ms. Clark's testimony was incredible. However, Mr. Griffin's recital of the facts leaves out much of the evidence admitted at trial against him. The postal worker's testimony indicated that the black Cadillac was the robber's get-away car. A maintenance worker testified that a man in a long black coat exited the black Cadillac and entered 6873 Teutonia Avenue. Mr. Griffin was discovered in the apartment where the money was found. In addition, the black coat containing the keys to the Cadillac was also found in the apartment, and Ms. Clark testified that it was Mr. Griffin's coat and car. Ms. Clark also testified that Mr. Griffin had brought her brother to her apartment a week before the robbery, and that he was sitting on the bed with Mr. Clark as Clark counted the bank's money. From this circumstantial evidence a reason-

able jury could conclude that Mr. Griffin was involved ·in the robbery. *See id.* at 532.

■ The fact that Mr. Griffin was not identified by any eyewitnesses means little since he did not enter· the bank but drove the get-away car. Moreover, we do not agree that Ms. Clark's testimony was incredible as a matter of law. To be incredi-· ble as a matter of law, Ms. Clark's testimony must be based on an event that was physically impossible for her to observe or impossible to have happened at all. *Id.* at 531. Ms. Clark's testimony is neither.

■ Mr. Griffin's true complaint is that the jury found Ms. Clark credible despite the fact that she had a strong incentive to testify for the government. Following the defendants' arrests, Ms. Clark was ordered to report to the district attorney's office regarding the sixty-three grams of cocaine and four handguns that were found in her apartment. Notwithstanding inconsistent explanations for the contraband, Ms. Clark was never charged with a crime. Thus, Mr. Griffin believes that Ms. Clark's testimony was fabricated to serve her self-interest. Many witnesses have motivations for testifying that are less than pristine; herein lies the purpose of cross-examination. During cross-examination, defense counsel thoroughly explored Ms. Clark's connection with the cocaine and her motivations for testifying against her brother.

Although Ms. Clark's motivations may have been less than pure, we cannot say her testimony was wholly unbelievable. Thus, Ms. Clark's credibility was clearly a question properly left to the jury. *See id.* at 531 (witness' "motives and credibility were for the jury to consider"); *United States v. Jackson*, 935 F.2d 832, 843 (7th Cir.1991) (jury appropriately considers witness' criminal history and biases). Because we will not reweigh the evidence or judge the credibility of witnesses, we conclude that sufficient probative evidence supported the jury's verdict convicting Mr. Griffin.

## V.   Conclusion

For the foregoing reasons, we AFFIRM the convictions of Ernest Clark and Eric Griffin.