**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Anthony ZOLICOFFER and John Lewis Ross, Jr., Defendants–Appellants.**

**Nos. 95–3856, 95–3915.**

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1996.

Decided Aug. 8, 1996.

Eric J. Klumb, Thomas P. Schneider, Annette K. Ziegler (argued), Office of U.S. Atty., Milwaukee, WI, for U.S. in No. 95–3856.

James A. Shapiro (argued), Chicago, IL, for Anthony Duane Zolicoffer.

Eric J. Klumb, Annette K. Ziegler, Office of U.S. Atty., Milwaukee, WI, for U.S. in No. 95–3915.

John L. Ross, Jr., Terre Haute, IN, pro se.

Winston P. Brown, Milwaukee, WI, for John L. Ross, Jr.

Before ESCHBACH, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

An older model yellow and brown station wagon with wood-grained paneling. While one can easily imagine Mr. and Mrs. Brady using that sort of car to take their bunch to church, it's not the kind of vehicle one readily associates with crooks fleeing a bank heist. But that's the getaway car used by the robbers of a bank in Milwaukee last summer. And the distinctiveness of the vehicle helped collar the crooks. Here are the facts.

During the morning of June 15, 1995, a robber approached a teller, Tammie Boyd, at the Tri City Bank and cursed her while demanding money. He said, "Put the motherfucking money on the counter, bitch, now." The robber then stepped back, lifted up his shirt to reveal what appeared to be the butt of a gun sticking out of his waistband, and shouted his demands again. Boyd gave the robber money, which he stuffed into a white

sack or pillowcase. He then ran out the door, jumped into the passenger side of the distinctive station wagon we described, and fled.

The bank is located in a strip mall with other businesses, including All State TV. As the station wagon, tires screeching, went through the mall, Timothy Duer, who works at All State, took note. From where he stood, he was able to see the driver but not the passenger as the station wagon zipped by. He continued to watch the car as it traveled the length of the mall, rounded the corner, and sped off. When police quickly arrived, Duer described the driver of the getaway car as a black male with a dark complexion and a full face. Duer (and others) also described the distinctive getaway car, which was last seen entering an expressway heading south. The police put out a broadcast.

Meanwhile, Donald Emmerich was driving north on the same expressway the crooks were using. Emmerich, a 64–year–old freelance photojournalist, was listening to a police scanner as he drove, and he heard the report of the robbery. When he learned the robbers were heading south, he alertly did a quick off-and-on and reentered the expressway so he would be traveling in the same direction they were going. In a matter of moments he spotted the station wagon and began to follow it.

After a short while, the two cars exited the freeway, with Emmerich calling the police on a 911 line to report what was happening. Emmerich believed the suspects noticed he was trailing them because they began driving evasively. Soon the car stopped and the passenger jumped out with a white bundle in his hands, turning for a moment to look directly at Emmerich. The passenger hightailed it into an alley. The wagon then drove a block further and pulled over. The driver got out, turned to look at Emmerich, and then ditched the car and ran off. Emmerich watched as the driver ran through a few yards and into the same alley the passenger had entered.

When the police came, Emmerich gave descriptions of both men. He described the passenger as a black male with shoulder-length hair wearing dark pants, a white T-shirt, a baseball cap, and sunglasses. He said the driver was a black male about 5 feet 8 inches to 5 feet 10 inches, more stout than the passenger, of medium build, and wearing dark jeans and a white dress shirt with short sleeves.

In a matter of moments the police verified that the station wagon was registered to Tanya (or Joyce) Zolicoffer, who lived several blocks away from where the car was abandoned. Police went to the Zolicoffer home (only six minutes had passed) and talked with a neighbor, Wesley Suber, who said Anthony Zolicoffer had just entered the Zolicoffer home and that a couple of minutes later another fellow—Wesley thought his name was "John" something—came out from behind a garbage can and also entered the house.

After the police knocked on the door of the Zolicoffer home for several minutes, Kathy Zolicoffer, Anthony's aunt, finally answered. She gave permission for the officers to step inside the home and told them that no one else, except for James Zolicoffer, was home. She went upstairs to get James, the owner of the home. James then came downstairs and gave consent to the police to search for the suspects. After searching the basement, the officers came up through the kitchen and entered a closed room in the southeast corner of the residence. When Officer George Bauer opened the door to the room, he saw John Ross and Anthony Zolicoffer, who looked to be dressed like the men Emmerich had described. They were placed under arrest, taken outside, and put into individual paddy wagons.

About 45 minutes later, Emmerich and Duer were taken to the Zolicoffer residence and asked to identify the suspects. Ross was taken out of the paddy wagon in handcuffs and placed about twenty feet in front of Duer. Duer, you recall, had only seen the driver. He could not identify Ross. Then Zolicoffer was taken out of another paddy wagon, and Duer identified him as the driver of the car he observed fleeing the mall. Before Emmerich viewed the suspects, he was told by the police that they had caught two

men they believed to be the robbers. Like Duer, he was placed in a squad car and asked to identify the suspects when they were removed from the paddy wagons and presented to him individually. He identified Ross as the passenger of the car he had followed, and Zolicoffer as the driver.

Zolicoffer and Ross were charged with bank robbery and with using a firearm in connection with the robbery. In addition, Ross was charged with being a felon in possession of a firearm. They were tried separately, and the evidence against them was considerable. Ross was identified by several tellers at the bank, and Emmerich identified him as the passenger who fled from the station wagon. Zolicoffer was identified by Duer and Emmerich. In addition, the jurors learned that loose $50 bills were found on the floor (and $100 bills behind the couch) of the room where Ross and Zolicoffer were snagged. Ross was convicted on all three counts and ultimately sentenced to 262 months, the lowest sentence in the applicable guideline range. The second count against Zolicoffer was dismissed. He was convicted of aiding and abetting Ross in the robbery and was sentenced to 96 months in prison.

■ The primary argument Zolicoffer raises on appeal concerns the identifications by Duer and Emmerich. To successfully challenge the admissibility of identification evidence, a defendant must first show that the initial identification procedure—in this case a showup on the street—was unduly suggestive. *United States v. Funches*, 84 F.3d 249, 252 (7th Cir.1996). The inquiry, however, does not end there; determining whether an identification procedure is unduly suggestive is only the first step. *United States v. Larkin*, 978 F.2d 964, 970 (7th Cir.1992). The second step is to determine "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977) (quoting *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)); *United States v. Clark*, 989 F.2d 1490, 1495 (7th Cir.1993) ("The primary evil to be avoided is a very substantial likelihood of irrepara-

ble misidentification." (Internal quotation omitted.)). Several factors must be taken into account in determining whether an identification is reliable despite an unduly suggestive procedure: (1) the witness's opportunity to see the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's description given prior to the suggestive procedure; (4) the level of certainty the witness demonstrates in making the identification; and (5) the amount of time between the initial viewing and the identification procedure. *Manson*, at 114, 97 S.Ct. at 2253.

After an evidentiary hearing on a motion to suppress, Magistrate Judge Goodstein found that the identification procedures the police used for Duer and Emmerich were unduly suggestive, and were not justified by any recognized exception. Proceeding to the next step in the analysis, he then examined the identifications in light of the five factors set out in *Manson*.

With regard to Duer's identification of Zolicoffer, the magistrate judge made the following findings of fact, which we review for clear error. Duer saw the driver of the car from about 100 feet away for between 6 and 15 seconds. The sound of tires screeching caused Duer to focus his attention on the car. The description of the driver he gave the police matched Zolicoffer's physical characteristics, and Duer testified that he was certain Zolicoffer was the driver of the car he had seen.

Turning to Emmerich's identification, the magistrate judge noted that since Emmerich was following the car, he saw the back of the driver's head for a long time, but only saw his face for a second. Emmerich was going on the assumption that he was following the bank robbers described on the scanner, so he was paying close attention. Also, as a professional photographer, Emmerich was likely to be particularly aware of visual details. The description he gave to the police turned out to be accurate. He testified that he was between 95 and 98 percent certain of the identification and said that he wouldn't have made the identification unless he was sure. As with Duer's I.D. of Ross, only about an hour passed between the time Emmerich saw

the driver and the passenger and the time he identified Zolicoffer and Ross.

Based on these facts, the magistrate judge found that the Duer and the Emmerich identifications were sufficiently reliable to permit the jury to hear about them. Judge Curran, the district judge who tried the cases, agreed.

On appeal, Zolicoffer does not challenge the district court's findings concerning the degree of attention the witnesses paid, the amount of time between initial viewing and identification, the certainty of the witnesses, or the accuracy of the prior descriptions. According to Zolicoffer, the "only issue is whether this court can affirm a finding of reliability when the district court has found an inadequate opportunity to view the suspect." Unfortunately for Zolicoffer, this argument is based on a mischaracterization of the magistrate judge's recommendation.

In examining both identifications, Judge Goodstein found that four of the five factors clearly weighed in favor of a finding of reliability. The only thing that was "arguable" or "questionable" was whether the witnesses had adequate opportunity to view the suspects prior to the showup. Whether one second is sufficient to absorb enough visual information to reliably identify a person is certainly more open to question than whether "98 percent certain" is certain enough. But there is no cut-off mark beyond which a viewing is too brief to be reliable. Nor is there a rule requiring a witness to have been standing within a certain number of feet of a suspect. A brief sighting from considerable distance may be reliable under some circumstances, while an extended, close-up view may be unreliable under others. The language Zolicoffer relies on from the magistrate judge's recommendation simply acknowledges that this factor is less clear-cut in this case than the other factors. Nowhere did Judge Goodstein make a finding that Duer and Emmerich had inadequate opportunity to view the driver of the getaway car. And while he never made an explicit finding that this element was present either, a finding of adequate opportunity is implicit in the judge's conclusion that the identifications were reliable. The district court did not err in adopting the magistrate judge's recommendation.

Ross instructed his court-appointed attorney to appeal, but counsel instead has filed an *Anders* brief stating that an appeal would be frivolous. The lawyer is right; Ross lacks plausible appellate contentions. Ross wanted his attorney to argue that his sentence was excessive and that it constitutes cruel and unusual punishment, though it was the minimum within the guideline range; that a mandatory five-year sentencing enhancement violates the double jeopardy clause, though the statute expressly requires cumulative punishment; and that he should have been given grand jury witnesses' names and transcripts, though they did not testify at trial.

Ross also raised a sufficiency of the evidence argument. Both Zolicoffer and Ross claim there was insufficient evidence that Ross used a weapon when he robbed the bank. In determining whether sufficient evidence exists to support a conviction, we must view the evidence in the light most favorable to the prosecution. *United States v. Vega*, 72 F.3d 507, 513 (7th Cir.1995). The evidence will be found insufficient only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Lemons v. O'Sullivan*, 54 F.3d 357 (7th Cir.1995). The evidence about the weapon came from Ms. Boyd, the teller. She testified that Ross displayed to her what appeared to be a gun tucked into the waistband of his pants, from a distance of no more than five feet. She was sure it was a gun when she saw it. Later, she was able to describe in detail the portion of the gun she saw and, when showed pictures of guns for identification purposes, was able to narrow it down to two. It was not irrational for the jury to conclude from this evidence that Ross was armed when he robbed the bank. Ross's appeal is dismissed, and his counsel's motion to withdraw is granted. Zolicoffer's conviction is affirmed.