Sylvester ABRAMS, Petitioner–Appellant,

v.

Paul BARNETT, Warden, Danville Correctional Center, Respondent–Appellee.

No. 95–4065.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1996.

Decided Nov. 8, 1996.*

On Remand from the Supreme Court of the United States, June 27, 1997.

Submitted July 25, 1997.**

Decided Aug. 14, 1997.

---

* *Abrams v. Barnett,* 100 F.3d 485 (7th Cir.1996).

** After an examination of the original briefs filed in this case and the record, we have concluded that oral argument and rebriefing are unnecessary; accordingly, the appeal is considered on the existing pleadings and the record. See Fed. R.App.P. 34(a); Cir. R. 34(f).

Frederick F. Cohn (submitted), Chicago, IL, for Petitioner–Appellant.

Rita M. Novak, Office of the Attorney General, Chicago, IL, for Respondent–Appellee.

Before BAUER, FLAUM and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

The Supreme Court vacated our earlier judgment in this case and remanded for further consideration in light of the Court's decision in *Lindh v. Murphy*, —— U.S.——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). *See Abrams v. Barnett*, 100 F.3d 485 (7th Cir. 1996), *vacated, Abrams v. Barnett*, —— U.S. ——, 117 S.Ct. 2503, 138 L.Ed.2d 1008 (1997). Reversing a decision of this court, the Supreme Court held in *Lindh* that the amendments to chapter 153 of Title 28 enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), do not apply to cases, such as petitioner Sylvester Abrams', that were pending at the time the AEDPA was passed.

*See Lindh v. Murphy*, —— U.S. ——, 117 S.Ct. 2059, *rev'g Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996). Because we relied upon this provision in deciding Abrams' appeal, reconsideration of his claims is necessary.

Abrams raised three issues on appeal: (i) that his Sixth Amendment right to effective assistance of counsel and his Fourteenth Amendment right to testify were violated when the trial court prohibited him from consulting privately with counsel during a noon-time recess in the trial; (ii) that the use of a suggestive identification procedure by police denied him due process in violation of the Fourteenth Amendment; and (iii) that various evidentiary rulings made by the trial judge violated his Fourteenth and Sixth Amendment rights. Applying the prior version of section 2254, we once again conclude that Abrams' petition was properly denied by the district court.

I.

We begin by noting the manner in which our review of Abrams' claims under the old version of section 2254 differs from our prior review of these same claims under the amended version of section 2254. Petitioners seeking a writ under the new section 2254(d) face some additional obstacles in demonstrating that they are in custody in violation of federal law. First, the AEDPA made it more difficult for a petitioner to challenge the manner in which a state court applied federal law to the particular facts of his case. Under the new section 2254(d), a federal court reviews these determinations for reasonableness only, whereas the prior law provided for plenary review of these claims.

Second, the amended provision narrowed the body of law on which a petitioner may rely in challenging a state conviction. A petition is granted under the new law only if a state court's decision is contrary to "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). As this court has recognized, this is a "retrenchment from former practice, which allowed the United States courts of appeals to rely on their own jurisprudence in addition to that of the Supreme

Court." *Lindh,* 96 F.3d at 869. Because we now review Abrams' claims under the old section 2554, he is entitled to both the benefit of an expanded body of law in challenging his conviction and to a more exacting review of any claims involving the application of federal law to the facts of his case.[1]

## II.

Under either version of section 2254, this court must accept the reasonable factual findings of the state trial and appellate courts as true. 28 U.S.C. § 2254(e)(1) (1996);[2] *Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *Mills v. Jordan,* 979 F.2d 1273, 1279 (7th Cir.1992). The following facts, taken from our original opinion in this case, *see Abrams,* 100 F.3d at 487–89, were derived from the state appellate court opinion and from the trial record.

At trial, two witnesses testified to having seen Abrams shoot Leroy Williams on January 3, 1990. The first of these witnesses was Jennifer Williams, the victim's sister. Jennifer was standing in the entryway of her aunt's apartment watching her brother load boxes into his car when she noticed a group of seven males huddled on the street corner. She recognized one of these men as Abrams, whom she knew by the nickname "Dusty." Jennifer had an unobstructed view of Abrams from where she was standing approximately 50 or 60 feet away. She saw him fire two shots at her brother, run around the building toward the alley, and then fire three more shots at Leroy, fatally wounding him.

Jennifer told the police when they arrived on the scene that "Dusty" had shot her brother. She testified that she provided no description of the assailant to any officer with whom she spoke at the scene. Later that night, the police took Jennifer to the station. She was told that she would view a lineup in order to identify the suspected murderer. Police led her into a room with a window that exposed another room where Abrams was seated at a table by himself.

Jennifer denied on cross-examination that the police had warned her beforehand that Abrams would be in the room. However, Detective Mike Miller, the officer who arrested Abrams, responded affirmatively on cross-examination when asked whether he had informed Jennifer beforehand that she would be seeing Abrams. Miller explained that a lineup was not employed in this case because there was no question that Jennifer knew the identity of the shooter. Because the purpose of the identification would be to exclude Abrams, if possible, a lineup would be a waste of police resources. Officer Williams also testified that, when he went to Abrams' home to arrest him, Abrams attempted to slam the door, ran for the back of the apartment, and had to be wrestled to the ground by the police.

Jennifer had known Abrams for approximately five years prior to the shooting and had seen him in the neighborhood nearly every day in those five years. They were fairly well-acquainted and had played cards together. She testified that, although Abrams weighed approximately 260 pounds at the time of trial, he had been "lighter," weighing approximately 160 pounds, at the time of the shooting. This testimony was contradicted by that of Detective Miller, the arresting officer, who described Abrams as weighing approximately 260 pounds at the time of his arrest. Jennifer was also acquainted with three of Abrams' brothers, including his brother Jimmy, with whom she went to school. She described Jimmy as shorter than Abrams, with a light-brown complexion and curls in his hair.

Officer Bruce Brady testified that while he was on patrol on January 4, 1990 he observed a man being followed by a group of men wielding baseball bats. The group of men shouted that the man they were pursuing was carrying a gun. Officer Brady arrested the man and, in the course of a custodial search, recovered a .38 caliber revolver. The

---

1. Because Abrams' original brief was filed before the AEDPA went into effect, his arguments were not tailored to take into account the requirements of the new habeas corpus provisions.

2. Former section 2254(d)'s presumption of factual correctness is now contained in section 2254(e).

officer later learned that the arrestee was Jimmy Abrams, petitioner's brother. Ballistics reports revealed that the .38 that was recovered was the weapon used to kill Leroy. At the time of his arrest, Jimmy was 5'5" and weighed 145 pounds.

Chicago police officer Consuelo Morgan and her partner were the first officers to arrive at the scene. Morgan questioned the persons who had gathered around the body of the victim. Her report indicates that she was given a description of the perpetrator as being 5'6" and 185 pounds. She testified that she had written the names of some of the witnesses with whom she spoke but omitted others "because they were afraid to speak." The defendant objected to this statement. The trial judge sustained the objection and ordered the response stricken but denied Abrams' motion for a mistrial. Morgan testified that Jennifer did not give a description of the shooter because she was in shock, but that Jennifer did identify the shooter as "Dusty." Detectives John McKenna and Dave Delponte, who were assigned to investigate the murder, filed a report at the end of their shift in which the perpetrator was described as 5'6" and weighing 160 pounds.

The second witness who testified to having seen the defendant shoot Leroy was Nakita Bailey, the victim's cousin. Nakita had an unobstructed view from the front window of her third floor apartment of the street and saw "Dusty" fire two shots at Leroy, disappear for about a minute, and then fire three more shots. Nakita had been aware of who Abrams was for approximately three years prior to the shooting. On cross-examination, after being reminded that she had not told anyone what she had witnessed until almost two years after the shooting, she explained that she decided to tell Jennifer what she had witnessed after Jennifer complained to her that no one had come forward to testify against Abrams. On redirect examination, after being asked why she had not come forward earlier, she stated, "I was afraid the gang members would do the same to me." The trial judge overruled Abrams' objection to this answer.

Near the close of the state's case, the court allowed a two-hour recess for lunch. When court reconvened, defense counsel objected to the conditions under which he was permitted to speak with the petitioner during the recess. The following exchange took place:

THE COURT: Here comes Mr. Cohn. Mr. Cohn, you have had an opportunity to speak with your client now, is that right?

MR. COHN: Well, I don't think I have had an adequate opportunity to speak to my client. I object to the fact that during the noon recess I have been prohibited from being able to meet with my client in a private place in a private way other than through speaking to him through a tiny little hole where there are other people in the room back there, other inmates. It's not private, it's not confidential. . . .

THE COURT: I understand your concern. . . . The issue, of course, is a question of security and the sheriffs are especially, this week, very concerned about security as there was a significant security breach in this building last week. . . . I have given you an opportunity to at least speak here. With that I think we're ready to bring in the jury.

MR. COHN: "Here" means in open court with the State's Attorney and the sheriff and the Judge, everyone present.

THE COURT: I understand that. But I'm just suggesting these courtrooms are not designed to have private conversations and with the additional concern of security in the lock-up as well as in the rest of the room, it makes security issues quite complex. At this point the Chief Judge's order is in place and in force.

The petitioner took the stand in his own defense, denying that he had shot Leroy and denying that he had ever played cards with Jennifer. He testified that at the time of the shooting he was playing basketball with men whom he knew only by appearance.

A jury convicted Abrams of first-degree murder, and the court sentenced Abrams to thirty years of imprisonment. On direct appeal, the Appellate Court of Illinois affirmed his conviction, *People v. Abrams,* 260 Ill. App.3d 566, 197 Ill.Dec. 853, 631 N.E.2d 1312 (1994). Abrams subsequently filed a petition for writ of habeas corpus in federal district

court, which the district court denied, *Abrams v. Barnett,* No. 95 C 106, 1995 WL 758405 (N.D.Ill.Dec. 18, 1995).

## III.

■ We turn first to Abrams' claim that the trial judge violated his Sixth Amendment right to counsel by denying him the opportunity to consult privately with his attorney during a two-hour, noon-time recess in the trial.[3] He argues that his ability to confer with his attorney was impaired due to the trial court's failure to provide him with a room in which the two could consult privately. This impairment, according to Abrams, is a deprivation of the right to counsel as recognized by the Supreme Court in *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). In *Geders,* the Court held that a court order preventing the defendant from consulting with his attorney during a 17–hour overnight recess violated the defendant's Sixth Amendment right to counsel. *Id.* at 91, 96 S.Ct. at 1336.

In rejecting this contention in our prior opinion, familiarity with which will be assumed, we discussed the Court's decision in *Geders,* as well as this court's decision in *Sanders v. Lane,* 861 F.2d 1033 (1988). We distinguished these cases from the instant one, as both *Geders* and *Sanders* involved a total prohibition of attorney-client consultation during a trial recess. We found the Supreme Court's decision in *Perry v. Leeke,* 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), decided subsequent to these cases, to be more on point. In *Perry,* the Supreme Court made clear that not every prohibition on attorney-client consultation during trial violates the Constitution. *See id.* at 284, 109

S.Ct. at 601 (holding that defendant does not have constitutional right to advice during "short recess in which it is appropriate to presume that nothing but the testimony will be discussed"). After examining the facts and circumstances surrounding the alleged deprivation of counsel, we concluded that the conditions under which Abrams was permitted to speak to his attorney were not tantamount to a prohibition on attorney-client consultation, and that the rule of *Geders* was therefore inapplicable to his case.[4]

Our analysis of Abrams' claim was in no way constrained by amended section 2254's requirements, as we are guided, under either the old or new version of the law, by the Supreme Court's decision in *Perry.* While Abrams is entitled under the prior version of section 2254 to the benefit of a more expansive body of law in arguing his claim, he has pointed to no authority from this court or any other court of appeals holding unconstitutional the type of restrictions at issue in this case. We therefore conclude that his claim was properly denied.

## IV.

■ Abrams' second argument on appeal was that the "show-up" identification procedure [5] employed by the police was unduly suggestive and that the trial court's failure to suppress this identification evidence denied him due process of law. Abrams contends that police sought to have Jennifer Williams identify him as the shooter despite the fact he did not match the physical description given to the police by other witnesses at the scene, who had described the assailant as 5'6" and weighing between 160 and 180 pounds. He points to the fact that the police

---

3. As we recognized in our prior opinion, *see Abrams,* 100 F.3d at 489 n. 2, Abrams did not raise on direct review to the Appellate Court of Illinois his claim that the inability to consult with his attorney in private violated his right to testify under the Fourteenth Amendment; he has therefore waived the right to have this claim reviewed in federal habeas corpus proceedings. *See Farrell v. Lane,* 939 F.2d 409, 411 (7th Cir.1991).

4. In addition, as we noted in our original opinion, the absence of any meaningful explanation to the court by Abrams' counsel as to why it was necessary to confer privately with his client provides further support for our holding that

Abrams was not unconstitutionally deprived of counsel. *See Abrams,* 100 F.3d at 491–92 (citing *Crutchfield v. Wainwright,* 803 F.2d 1103, 1110 (11th Cir.1986) (recognizing that defendant or defense counsel must indicate desire to consult and stating that such a rule "satisfies [the] concern for the important constitutional right of assistance of counsel, provides for the orderly conduct of trials, and makes sense")).

5. A show-up "occurs when only one suspect is presented to [the] witness[ ]." *United States v. Clark,* 989 F.2d 1490, 1495 n. 2 (7th Cir.1993).

informed Jennifer prior to the show-up that she would be viewing Abrams and argues that the police seated him behind a table in order to conceal that he was 5'11" and weighed 260 pounds.

In initially reviewing this claim, guided by the amended provisions of section 2254, we inquired only whether the state court's determination that the identification procedure was not unduly suggestive reflected an "unreasonable application of" federal law. As discussed in Part I of this opinion, this standard was a departure from the prior law, which provided for plenary review of claims such as Abrams', which are mixed questions of law and fact, *see Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (constitutionality of identification is mixed question of law and fact); *Armstrong v. Young*, 34 F.3d 421, 427 (7th Cir.1994) (same). Prior to the amendment of section 2254, federal courts were free to "give different weight to the facts as found by the state court and . . . [to] reach a different conclusion in light of the legal standard." *Montgomery v. Greer*, 956 F.2d 677, 680 (7th Cir.1992) (quoting *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (per curiam)). We now conduct this more exacting review.

■ In determining the constitutionality of an identification procedure, we undertake a two-step analysis. As an initial matter, the petitioner bears the burden of demonstrating that the challenged procedure was unduly suggestive. *See United States v. Funches*, 84 F.3d 249, 253 (7th Cir.1996); *United States v. Larkin*, 978 F.2d 964, 970 (7th Cir.1992). If the petitioner succeeds in making this showing, we must then determine whether, considering the totality of the circumstances, the identification was sufficiently reliable to prevent misidentification. *Id.* In assessing the reliability of an identification, we consider the following factors, first articulated by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972): "[ (1) ] the opportunity of the witness to view the criminal at the time of the crime, [ (2) ] the witness' degree

of attention, [ (3) ] the accuracy of his prior description, [ (4) ] the level of certainty demonstrated at the confrontation, and [ (5) ] the time between the crime and confrontation." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 140 (1977) (citing *Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–383).

While the use of show-up identification procedures " 'has been widely condemned,' " *Armstrong*, 34 F.3d at 427 (quoting *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)), we are not particularly troubled by the use of this procedure in the instant case. As we have noted on prior occasions, "showups are proper and not unduly suggestive under certain circumstances." *See id.* (quoting *United States v. Clark*, 989 F.2d 1490, 1495 (7th Cir.1993)). Because Jennifer had identified the shooter by name as someone she knew, the show-up served only to verify that she was not mistaken as to who "Dusty" was. We are, however, less comfortable with the manner in which police conducted this particular show-up: seating a suspect behind a table so as to obscure both his height and weight hardly facilitates an accurate identification. Given that other witnesses at the scene described the shooter as being considerably shorter and lighter than Abrams (by approximately five inches and one hundred pounds), it was even more important that Jennifer view Abrams in a manner that revealed his true proportions. Under these circumstances, we conclude that Abrams has demonstrated that the procedure employed was unduly suggestive.[6]

■ We turn then to the question of whether the identification, despite the law enforcement authorities' use of an unnecessarily suggestive procedure, was nevertheless sufficiently reliable. The Appellate Court of Illinois, applying these factors, concluded that there was not a substantial likelihood that Jennifer had misidentified Abrams. As mentioned above, we need not accept the Illinois appellate court's conclusion on this issue, and are free to reweigh the *Biggers*

---

6. The Appellate Court of Illinois assumed, without deciding the issue, that the show-up was unreasonably suggestive. *See Abrams*, 197 Ill. Dec. 853, 631 N.E.2d at 1325.

factors. The findings of fact that underlie the state court's conclusion, however, are presumed correct. See *Armstrong*, 34 F.3d at 427; *Montgomery*, 956 F.2d at 680. "[O]n such facts as whether the witness had an adequate opportunity to observe the individual who is later identified, whether the witness' description was sufficiently detailed and accurate, and whether the witness was under pressure from law enforcement officials when she made the identification," we follow the state court's findings. *Id.* at 427 (citing *Sumner*, 455 U.S. at 597, 102 S.Ct. at 1306).

We therefore accept as true that Jennifer "had a clear view" of Abrams throughout the incident and that she "gave detailed attention to the individual who shot her brother." *Abrams*, 197 Ill.Dec. at 864, 631 N.E.2d at 1325. As for the accuracy and certainty of Jennifer's description, we adopt the following findings:

> With respect to the accuracy of her description and the certainty with which she established the identification, the record clearly reflects that from the beginning, her testimony had been that the murderer was "Dusty," whom she knew quite well from the neighborhood. Defendant admits that he is known as Dusty. Despite defendant's repeated efforts, Jennifer never admitted that she gave the physical characteristics which had been included in various police reports and which purportedly described defendants brother; moreover, she acknowledged knowing defendant's brother, upon whom defendant attempted to deflect culpability for his crime, and she stated without pause that Jimmy Abrams was not the shooter.

*Id.*, 197 Ill. Dec. at 865, 631 N.E.2d at 1326. That only a matter of hours passed between the time of the shooting and the time Jennifer viewed Abrams at the police station also contributes to the reliability of her identification.

Considering the totality of these circumstances, we conclude that there was not "a very substantial likelihood of irreparable misidentification." *Manson*, 432 U.S. at 116, 97 S.Ct. at 2253. "Short of that point, such evidence was for the jury to weigh." *Id.* As the Court noted in Manson: "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id.* Jennifer was examined extensively as to the description of Abrams that she gave to investigators and as to her recollection of Abrams' weight at the time of the shooting. That Jennifer recalled Abrams being lighter than police records indicate he was at the time of his arrest was a matter considered by the jury in assessing her credibility and the accuracy of her identification. We therefore conclude that the admission of evidence of Jennifer's out-of-court identification did not deny Abrams due process.

## V.

■ Lastly, in our prior opinion, we rejected Abrams' contention that various evidentiary rulings made by the trial judge deprived him of due process. We began by noting that "[t]he admissibility of evidence is generally a matter of state law" and that, "[a]bsent a showing that the admission of evidence violated a specific constitutional guarantee, a federal court can issue a writ of habeas corpus . . . only when the ruling violated the defendant's right to due process. . . ." *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir.1994). After examining the alleged errors, we concluded that none of the state court's rulings were erroneous, much less resulted in a denial of Abrams' right to a fundamentally fair trial. Our examination of these claims was in no way limited by the amendments to section 2254. We therefore adopt our prior discussion of these issues *in toto*. See *Abrams*, 100 F.3d at 493–94.

For the foregoing reasons, we once again AFFIRM the judgment of the district court denying Abrams' petition for writ of habeas corpus.