Sylvester ABRAMS, Petitioner–Appellant,

v.

Paul BARNETT, Warden, Danville Correctional Center, Respondent–Appellee.

No. 95–4065.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1996.

Decided Nov. 8, 1996.

---

Frederick F. Cohn, argued, Chicago, IL, for Sylvester Abrams.

Rita M. Novak, Office of Atty. Gen., Chicago, IL, Catherine Glenn, argued, Office of Atty. Gen., Crim. Appeals Div., Springfield, IL, for Paul Barnett.

Before BAUER, FLAUM and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

A jury convicted Petitioner Sylvester Abrams of first degree murder, and the Ap-

pellate Court of Illinois affirmed his conviction on direct appeal, *People v. Abrams,* 260 Ill.App.3d 566, 197 Ill.Dec. 853, 631 N.E.2d 1312 (1994). Abrams subsequently filed a petition for writ of habeas corpus in federal district court. The district court denied his petition, *U.S. ex rel. Abrams v. Barnett,* No. 95 C 601, 1995 WL 758405 (N.D.Ill. Dec. 18, 1995), and Abrams now appeals, alleging (i) that his Sixth Amendment right to effective assistance of counsel and his Fourteenth Amendment right to testify were violated when the trial court prohibited him from consulting privately with counsel during a noon-time recess in the trial; (ii) that the use of a suggestive identification procedure by police denied him due process in violation of the Fourteenth Amendment; and (iii) that various evidentiary rulings made by the trial judge violated his Fourteenth and Sixth Amendment rights. We conclude that Abrams' constitutional rights have not been violated and therefore affirm the judgment of the district court.

## I.

Because this case comes to us on petition for writ of habeas corpus, this court must accept the factual findings of the state trial and appellate courts as true. 28 U.S.C. § 2254(e)(1) (1996);[1] *Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *Mills v. Jordan,* 979 F.2d 1273, 1279 (7th Cir.1992). The following facts are taken from the state appellate court opinion and from the trial record.

At trial, two witnesses testified to having seen Abrams shoot Leroy Williams on January 3, 1990. The first of these witnesses was Jennifer Williams, the victim's sister. Jennifer was standing in the entryway of her aunt's apartment watching her brother load boxes into his car when she noticed a group of seven males huddled on the street corner. She recognized one of these men as the petitioner, whom she knew by the nickname "Dusty." Jennifer had an unobstructed view of Abrams from where she was standing approximately 50 or 60 feet away. She saw him fire two shots at her brother, run around

the building toward the alley, and then fire three more shots at Leroy, fatally wounding him. Abrams was wearing a "Christmas green" jogging suit at the time.

Jennifer told the police when they arrived on the scene that "Dusty" had shot her brother. She testified that she provided no description of the assailant to any officer with whom she spoke at the scene. Later that night, the police took Jennifer to the station. She was told that she would view a lineup in order to identify the suspected murderer. Police led her into a room with a window that exposed another room where the petitioner was seated at a table by himself.

Jennifer denied on cross-examination that the police had warned her beforehand that the petitioner would be in the room. However, Detective Mike Miller, the officer who arrested the petitioner, responded affirmatively on cross-examination when asked whether he had informed Jennifer beforehand that she would be seeing Abrams. Miller explained that a lineup was not employed in this case because there was no question that Jennifer knew the identity of the shooter. Because the purpose of the identification would be to exclude the petitioner, if possible, a lineup would be a waste of police resources. Officer Williams also testified that, when he went to Abrams' home to arrest him, Abrams attempted to slam the door, ran for the back of the apartment, and had to be wrestled to the ground by the police.

Jennifer had known Abrams for approximately five years prior to the shooting and had seen him in the neighborhood nearly every day in those five years. They were fairly well-acquainted and had played cards together. She testified that the petitioner was dark-skinned and approximately 260 pounds at the time of trial, but described him as "lighter," weighing approximately 160 pounds at the time of the shooting. This testimony was contradicted by that of Detective Miller, the arresting officer, who described the petitioner as weighing approxi-

---

1. The former section 2254(d) was redesignated as section 2254(e) by section 104 of the Antiter-

rorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214.

mately 260 pounds at the time of his arrest. Jennifer was also acquainted with three of petitioner's brothers, including his brother Jimmy, with whom she went to school. She described Jimmy as shorter than the petitioner, with a light-brown complexion and curls in his hair.

Officer Bruce Brady testified that while he was on patrol on January 4, 1990 he observed a man being followed by a group of men wielding baseball bats. The group of men shouted that the man they were pursuing was carrying a gun. Officer Brady arrested the man and, in the course of a custodial search, recovered a .38 caliber revolver. The officer later learned that the arrestee was Jimmy Abrams, petitioner's brother. Ballistics reports revealed that the .38 that was recovered was the weapon used to kill Leroy. At the time of his arrest, Jimmy was 5 feet 5 inches and weighed 145 pounds.

Chicago police officer Consuelo Morgan and her partner were the first officers to arrive at the scene. Morgan questioned the persons who had gathered around the body of the victim. Her report indicates that she was given a description of the perpetrator as being 5 feet 6 inches and 185 pounds. She testified that she had written the names of some of the witnesses with whom she spoke but omitted others "because they were afraid to speak." The defendant objected to this statement. The trial judge sustained the objection and ordered the response stricken but denied Abrams' motion for a mistrial. Morgan testified that Jennifer did not give a description of the shooter because she was in shock, but that Jennifer did identify the shooter as "Dusty." Detectives John McKenna and Dave Delponte, who were assigned to investigate the murder, filed a report at the end of their shift in which the perpetrator was described as 5 feet 6 inches and weighing 160 pounds.

The second witness who testified to having seen the defendant shoot Leroy was Nakita Bailey, the victim's cousin. Nakita had an obstructed view from the front window of her third floor apartment of the street and saw "Dusty" fire two shots at Leroy, disappear for about a minute, and then fire three more shots. When she first saw the petitioner, he

had been standing on the street corner wearing a green jogging suit. Nakita had been aware of who the petitioner was for approximately three years prior to the shooting. On cross-examination, after being reminded that she had not told anyone what she had witnessed until almost two years after the shooting, she explained that she decided to tell Jennifer what she had witnessed after Jennifer complained to her that no one had come forward to testify against the defendant. On redirect examination, after being asked why she had not come forward earlier, she stated, "I was afraid the gang members would do the same to me." The trial judge overruled Abrams' objection to this answer.

Near the close of the state's case, the court allowed a two-hour recess for lunch. When court reconvened, defense counsel objected to the conditions under which he was permitted to speak with the petitioner during the recess. The following exchange took place:

THE COURT: Here comes Mr. Cohn. Mr. Cohn, you have had an opportunity to speak with your client now, is that right?

MR. COHN: Well, I don't think I have had an adequate opportunity to speak to my client. I object to the fact that during the noon recess I have been prohibited from being able to meet with my client in a private place in a private way other than through speaking to him through a tiny little hole where there are other people in the room back there, other inmates. It's not private, it's not confidential. . . .

THE COURT: I understand your concern. . . . The issue, of course, is a question of security and the sheriffs are especially, this week, very concerned about security as there was a significant security breach in this building last week. . . . I have given you an opportunity to at least speak here. With that I think we're ready to bring in the jury.

MR. COHN: "Here" means in open court with the State's Attorney and the sheriff and the Judge, everyone present.

THE COURT: I understand that. But I'm just suggesting these courtrooms are not designed to have private conversations and with the additional concern of security in the lock-up as well as in the rest of the

room, it makes security issues quite complex. At this point the Chief Judge's order is in place and in force.

The petitioner took the stand in his own defense, denying that he had shot Leroy and denying that he had ever played cards with Jennifer. He testified that at the time of the shooting he was playing basketball with men whom he knew only by appearance. The jury found Abrams guilty of first-degree murder, and the court sentenced Abrams to thirty years imprisonment.

## II.

■ As an initial matter, we note the standard of review applicable to Abrams' petition for habeas corpus. Under 28 U.S.C. § 2254, as amended by the Anti-terrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214, "an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that has been adjudicated on the merits in State court proceedings[,] unless" this court finds that the state court adjudication either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* at § 2254(d). In determining whether the Appellate Court of Illinois' decision was contrary to federal law, this court must rely on the jurisprudence of the Supreme Court of the United States. *See Lindh v. Murphy,* 96 F.3d 856, 869 (7th Cir.1996) (recognizing that the new § 2254(d) is a "retrenchment from former practice, which allowed the United States courts of appeals to rely on their own jurisprudence in addition to that of the Supreme Court.").

## III.

We turn now to Abrams' first argument. Abrams contends that the trial judge violated his Sixth Amendment right to counsel by denying him the opportunity to consult privately with his attorney during a two-hour, noontime recess in the trial.[2] Abrams argues that his ability to confer with his attorney was impaired due to the trial court's failure to provide him with a room in which the two could consult privately. This impairment, according to Abrams, is a deprivation of the right to counsel as recognized by the Supreme Court in *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976).

In *Geders,* the Supreme Court held that a court order preventing the defendant from consulting with his attorney during a 17–hour, overnight recess violated the defendant's right to assistance of counsel as guaranteed by the Sixth Amendment. *Id.* at 91, 96 S.Ct. at 1337. The Supreme Court found it relevant that the recess "was an overnight recess, 17 hours long" and that the court's order prevented the defendant from consulting with his client "about anything." *Id.* The Court found this total prohibition to be a *per se* violation of the defendant's right to assistance of counsel and reversed the defendant's conviction without requiring a showing of actual prejudice. The Court made clear, however, that it was dealing with a "17–hour overnight recess, when an accused would normally confer with counsel" and that it was not expressing an opinion on "an order barring communication between defendant and counsel during a 'brief routine recess during the trial day.'" *Id.* at 89 n. 2 & 91, 96 S.Ct. at 1336 n. 2 & 1337.

As this court recognized in *Sanders v. Lane, Geders* was an "extreme case" such that "it was easy for the Supreme Court to determine that the defendant was deprived of the right to counsel." 861 F.2d 1033, 1036 (1988), *cert. denied,* 489 U.S. 1057, 109 S.Ct.

**2.** Abrams did not raise on direct review to the Appellate Court of Illinois his claim that the inability to consult with his attorney in private violated his right to testify under the Fourteenth Amendment. Abrams has therefore waived the right to have this claim reviewed in federal habeas corpus proceedings. *See Farrell v. Lane,* 939 F.2d 409, 411 (7th Cir.), *cert. denied, Farrell v. McGinnis,* 502 U.S. 944, 112 S.Ct. 387, 116 L.Ed.2d 337 (1991).

1323, 103 L.Ed.2d 591 (1989). In *Perry v. Leeke*, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), the Supreme Court addressed the more difficult issue of whether the rule it announced in *Geders* applied to an order prohibiting counsel from speaking with his client during a 15-minute afternoon recess that occurred in the middle of the defendant's testimony. The Court held that, "in a short recess in which it is appropriate to presume that nothing but the testimony will be discussed, the testifying defendant does not have a constitutional right to advice." *Id.* at 284, 109 S.Ct. at 602. According to the Supreme Court, what was controlling in *Geders* was the fact that during an overnight recess it would be normal for the defendant to discuss matters on which the defendant has a constitutional right to seek advice, such as trial strategy and the availability of other witnesses. *Id.* The Court acknowledged that "the line between the facts of *Geders* and the facts of [*Perry* ] is a thin one," but stated that "[i]t is, however, a line of constitutional dimension." *Id.* at 280, 109 S.Ct. at 600. *Perry* therefore clarifies the rule announced in *Geders*, making clear that not every prohibition on attorney consultation during trial violates the Constitution.

In the instant case, we do not have before this court a case involving a "prohibition" on attorney consultation as in *Geders* and *Perry*, but rather only a denial of petitioner's request that the court provide him with a private location in which he could consult with his attorney during the lunch recess. The Appellate Court of Illinois correctly noted that *Geders* does not stand for the proposition that "a conviction must be reversed whenever conditions existed during trial which rendered client/attorney consultations less than ideal." *Abrams*, 197 Ill.Dec. at 859, 631 N.E.2d at 1318. *Perry* recognizes that, in cases less egregious than *Geders*, courts must determine whether the limitations imposed by the trial court are of "constitutional dimension." [3] See *Perry*, 488 U.S. at 280, 109 S.Ct. at 600. An examination of the surrounding facts and circumstances is therefore necessary to determine whether the defendant in fact was prohibited from consulting with counsel.[4]

▮ After examining the limitations imposed by the trial judge in the instant case, the Appellate Court of Illinois found that the trial judge "imposed no prohibition comparable to the sequestration order[ ] found in *Geders*...." *Abrams*, 197 Ill.Dec. at 859, 631 N.E.2d at 1318. In *Geders*, the defendant was prohibited from having any contact with his attorney during the overnight recess in the trial. In contrast, Abrams does not argue that the court ordered him not to consult with his attorney. Instead, he objects to not having been given the opportunity to consult with his lawyer in a "private place." As the appellate court noted, defense counsel declined to consult with his client during the recess, opting instead to ask the

---

**3.** The district court assumed the presence of a Sixth Amendment violation in order to "obviate[ ] the need to interpret the scope of the right of private consultation." *Abrams*, 1995 WL 758405, at *3. We, like the Appellate Court of Illinois, make no such assumption and therefore squarely address the issue of whether the trial judge's failure to provide a private location for petitioner to consult with his attorney during the recess violated petitioner's right to assistance of counsel.

**4.** In *Sanders v. Lane*, 861 F.2d 1033 (1988), *cert. denied*, 489 U.S. 1057, 109 S.Ct. 1323, 103 L.Ed.2d 591 (1989), a case decided prior to the Supreme Court's decision in *Perry*, this court addressed the issue of how courts should determine when a prohibition on attorney-client consultation violates the Sixth Amendment. We stated, "One way would be to allow the court to look at the circumstances—the length of the recess, the degree of the restriction, the status of

the proceedings, the presence or absence of an objection—and to decide, based on those factors, whether there has been a sixth amendment violation. This approach tends to build in some of the considerations that would be pertinent in assessing harmless error." *Id.* at 1036. We note that *Sanders* was a case involving a total prohibition on attorney-client consultation during a trial recess. An examination of the circumstances surrounding the court's prohibition was therefore unnecessary, as we held that the defendant need not establish prejudice in order to establish a Sixth Amendment violation. See *id.* at 1039. In contrast, in the instant case it is not at all clear that the court in fact prohibited the defendant from consulting with his attorney. An examination of the surrounding circumstances is therefore necessary to determine whether the conditions under which Abrams was permitted to speak with his attorney were tantamount to a prohibition on attorney-client consultation.

court to permit him to speak with his client in a private room. After the recess, defense counsel again opted not to utilize the opportunity offered by the court to speak with his client in the courtroom. We agree with the Appellate Court of Illinois that "the rule of *Geders* simply does not obtain in this case," *id.*, as Abrams was not prohibited from consulting with his attorney.

We do not mean to suggest that there are no circumstances in which the restrictions imposed by a court on the manner in which a defendant is permitted to consult with his attorney, short of an express order prohibiting attorney consultation, could amount to a deprivation of the right to assistance of counsel. We are mindful that the criminal defendant's right to counsel is one of fundamental importance; therefore, the opportunity afforded a defendant to exercise such right must be a meaningful one. However, we also bear in mind that the right protected by the Sixth Amendment is the right of effective assistance of counsel, not the absolute right to consult in a private place with one's attorney during every trial recess. *Cf. Perry*, 488 U.S. at 279, 109 S.Ct. at 599 (recognizing fundamental importance of right to counsel but holding that Sixth Amendment not violated). As the Supreme Court recognized in *Perry*, a thin line often separates one case from another, but the line nevertheless must be one of "constitutional dimension." Abrams has failed to show that the conditions under which he was permitted to speak with his attorney constituted a deprivation of his right to assistance of counsel. We therefore conclude that the determination of the Appellate Court of Illinois that Abrams' Sixth Amendment right to counsel has not been violated is consistent with the Supreme Court's decisions in *Geders* and *Perry*.

We note additionally that an examination of the record further supports the Appellate Court of Illinois' conclusion that Abrams failed to show that he had actually been deprived of assistance of counsel. In its opinion, the state appellate court cited *People v. Brooks* in which the Illinois Supreme Court explained that, in order to find that the court denied defendant his right to consult with counsel, the record must first re-flect that the court was made aware that consultation was desired. 115 Ill.2d 510, 106 Ill.Dec. 30, 34–35, 505 N.E.2d 336, 340–41, *cert. denied, Brooks v. Illinois,* 484 U.S. 825, 108 S.Ct. 91, 98 L.Ed.2d 52 (1987). In that case, the Illinois Supreme Court stated:

> '[It] is one thing to say that a defendant who has been deprived of the guiding hand of counsel need not demonstrate the prejudicial effect of that deprivation; it is quite another to say that he need not show that the challenged order deprived him of counsel he would otherwise have received.' In the absence of an objection to the court's order, or similar indication that consultation was desired, we cannot say that the trial judge's order denied the defendant her right to the assistance of counsel.

*Id.* (internal citations omitted). *See also Crutchfield v. Wainwright,* 803 F.2d 1103, 1110 (11th Cir.1986) (recognizing that defendant or defense counsel must indicate desire to consult and stating that such a rule "satisfies [the] concern for the important constitutional right of assistance of counsel, provides for the orderly conduct of trials, and makes sense"), *reh'g denied,* 810 F.2d 208 (1987), *cert. denied, Crutchfield v. Dugger,* 483 U.S. 1008, 107 S.Ct. 3235, 97 L.Ed.2d 740 (1987). The appellate court noted that the record reflected only that defense counsel objected to being unable to meet with his client in a private room; counsel offered no explanation as to why the level of privacy afforded by the court would not permit counsel to consult meaningfully with his client. Defense counsel elaborated at oral argument before this court, explaining that he had not previously reviewed with his client the questions that he would be asked on direct examination and that he was relying on the noon recess to prepare his client's testimony. However, the record does not indicate that counsel explained his position to the trial judge or that he requested a continuance in order to prepare his client.

The necessity for such an objection by the defendant is clear. The recess in the instant case was an unscheduled, two-hour recess which occurred on the final day of trial. Under such circumstances, it was logical for the trial judge to presume that the opportu-

nities available to counsel to meet with his client were adequate, as preparation of the defendant's testimony is not the type of assistance normally provided by counsel during an unscheduled recess on the final day of trial. As the Supreme Court recognized in *Perry,* the Court's decision in *Geders* was motivated by the fact that an attorney normally consults with his client on a variety of trial-related matters during an overnight recess. 488 U.S. at 284, 109 S.Ct. at 602. In contrast, the Court stated that there is no constitutional right to advice during a "short recess in which it is appropriate to presume that nothing but defendant's [ongoing] testimony will be discussed...." *Id.* The trial judge in this case appropriately assumed that the opportunities available to Abrams to consult with his attorney were adequate given the type of assistance normally provided during an unscheduled recess; counsel for the defendant did nothing to give the trial judge reason to think otherwise.

### IV.

Abrams next argues that the "show-up" identification procedure [5] employed by the police was unduly suggestive and that the trial court's failure to suppress the identification evidence denied him due process of law. Petitioner points to the fact that the police informed Jennifer Williams prior to the show-up that she would be viewing Abrams and argues that the police seated him behind a table in order to conceal that he was taller than 5 feet 6 inches and weighed more than 160 pounds. Abrams contends that police sought to have the witness identify him as the shooter despite the fact he did not match the physical description given to the police by other witnesses at the scene, who had described the assailant as 5 feet 6 inches and weighing between 160 and 180 pounds.

■ An identification procedure is unduly suggestive if, considering the totality of the circumstances, it creates "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). The

factors to be considered in determining the admissibility of identification testimony are "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and confrontation." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) (citing *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382).

■ The Appellate Court of Illinois, in applying the factors laid out by the Supreme Court in *Brathwaite,* found the following facts relevant: (1) that the witness "had a clear view of the defendant throughout the incident," (2) that the witness "gave detailed attention to the individual who shot her brother," (3) that an "insignificant amount of time elapsed from the time of the incident until the challenged identification occurred," (4) that the witness' testimony reflected from the beginning that "Dusty" was the murderer and that she knew "Dusty" "quite well from the neighborhood," (5) that the witness never admitted, despite defendant's repeated efforts, "that she had given the physical characteristics which had been included in various police reports and which purportedly described defendant's brother," and (6) that the witness knew the defendant's brother and "stated without pause that [he] was not the shooter." *Abrams,* 197 Ill.Dec. at 866–67, 631 N.E.2d at 1325–26.

The constitutionality of an identification is a mixed question of law and fact. See *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982); *Armstrong v. Young,* 34 F.3d 421, 427 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1369, 131 L.Ed.2d 224 (1995). When, as is true in this case, "the dispute lies not in the meaning of the Constitution, but in its application to a particular set of facts[,] ... § 2254(d)(1) restricts the grant of collateral relief to cases in which the state's decision reflects an 'unreasonable application of' the law." *Lindh v.*

---

5. A show-up "occurs when only one suspect is presented to [the] witness[ ]." *United States v.*

*Clark,* 989 F.2d 1490, 1495 n. 2 (7th Cir.1993).

*Murphy,* 96 F.3d at 870. The Appellate Court of Illinois correctly cited the factors that the Supreme Court has deemed relevant and, in applying these factors, the court carefully relied on evidence in the record to support its determination that the identification procedure at issue was constitutional. We therefore conclude that the state court's determination that Jennifer's identification was reliable was not the result of "an unreasonable application of" the law.

## V.

■ We turn next to Abrams' contention that various evidentiary rulings made by the trial judge deprived him of due process. We begin by noting that "[t]he admissibility of evidence is generally a matter of state law." *Milone v. Camp,* 22 F.3d 693, 702 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 720, 130 L.Ed.2d 626 (1995). "Absent a showing that the admission of evidence violated a specific constitutional guarantee, a federal court can issue a writ of habeas corpus on the basis of a state court evidentiary ruling only when the ruling violated the defendant's right to due process...." *Id.* We therefore issue a writ of habeas corpus only in those cases in which the court's evidentiary ruling can be said to have denied the defendant the right to a fundamentally fair trial. *See id.; Dudley v. Duckworth,* 854 F.2d 967, 972 (7th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989).

■ Abrams first argues that the trial judge's denial of the defense's motion to declare a mistrial after a prosecution witness made a hearsay statement denied him due process. Officer Morgan, after being asked by the prosecution whether all of the witnesses with whom she spoke were listed in her report, responded: "Some are listed in the case report and some are not because they were afraid to speak." We agree with the Appellate Court of Illinois that this hearsay was not so prejudicial as to warrant the declaration of a mistrial. The trial judge sustained the defense's objection and ordered the statement stricken from the record. As the state court noted, petitioner did not request that the court give a curative instruc-

tion, nor has he offered any evidence, other than a conclusory statement that the admission was prejudicial, in order to support his claim. We therefore conclude that trial court's failure to declare a mistrial did not deprive Abrams of a fundamentally fair trial.

■ Abrams next argues that the trial judge's admission into evidence of Nakita Bailey's testimony that she did not come forward until almost two years after the shooting because she was "afraid the gang members would do the same to [her]" denied him due process. Defendant contends that the suggestion that he was affiliated with a gang was highly prejudicial. Although we are cognizant that evidence of gang membership has a tendency to cast a defendant in an unfavorable light, this is not to say that such evidence is never relevant in a criminal trial. *See United States v. Thomas,* 86 F.3d 647, 652 (7th Cir.1996) (collecting cases); *United States v. Butler,* 71 F.3d 243, 251 (7th Cir. 1995) (collecting cases). As the trial judge and the state court recognized, this evidence was offered on redirect examination to rehabilitate the witness. On cross-examination, the defense brought out the fact that Nakita had waited nearly two years to report what she had witnessed. Nakita's statement was therefore necessary in order to rebut the defense's suggestion of recent fabrication and its admission cannot be said to have denied the defendant a fundamentally fair trial.

Lastly, Abrams argues that the trial judge excluded evidence which would have impeached the credibility of witness Jennifer Williams and which would have suggested that Jennifer incorrectly identified the petitioner as the assailant, when in fact the assailant was his brother Jimmy. Jennifer testified on direct examination that she knew Jimmy because they went to school together. When asked whether she had ever seen Jimmy around the neighborhood, she testified that "he never hung on Grenshaw Street," but that he frequented a gameroom on Roosevelt Road. She responded affirmatively when asked on cross-examination whether she had seen Jimmy during the two years prior to the incident.

In order to impeach Jennifer's credibility, defendant sought to introduce evidence that Jimmy had been incarcerated during the first six months of the two-year period during which Jennifer claims to have seen Jimmy. The trial judge excluded this evidence on the ground that it was prejudicial and of little probative value. We agree. The evidence Abrams sought to offer regarding Jimmy's incarceration was collateral to the issue of whether Jennifer had confused Abrams with his brother Jimmy. Given that the period of two years was only an estimate by the witness and the fact that the witness testified to having known Jimmy both from school and the gameroom she frequented, evidence of Jimmy's incarceration had very little probative value and would have served only to confuse and prejudice the jury.

Abrams also sought to elicit testimony from the officer who arrested Jimmy as to Jimmy's home address, which was two blocks from the location of the shooting. The petitioner sought to show that Jimmy could have been in the vicinity on the day of the shooting and to impeach Jennifer's testimony that "Jimmy never hung on Grenshaw Street," the street on which the shooting occurred. The trial court properly exercised its discretion in excluding this evidence for lack of relevance, as it was collateral to the issue of how Jennifer was acquainted with Jimmy. In addition, as the Appellate Court of Illinois recognized, Jimmy could have lived anywhere in the Chicagoland area and have still been in the area on the day of the shooting. The exclusion of such evidence can hardly be said to have denied petitioner the right to a fundamentally fair trial.

For the foregoing reasons, we AFFIRM the judgment of the district court denying Abrams' petition for writ of habeas corpus.